UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ON TRACK INNOVATIONS LTD., an Israeli company,<br><br>Plaintiff-Counterclaim Defendant,<br><br>vs.<br><br>T-MOBILE USA, INC., a Delaware corporation,<br><br>Defendant-Counterclaim Plaintiff. | Case No. 1:12-cv-02224-AJN-JCF |

**T-MOBILE'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO STRIKE**
**DR. APSEL'S CONCLUSORY AND UNRELIABLE INFRINGEMENT OPINIONS**

**IRELL & MANELLA LLP**
John C. Hueston (jhueston@irell.com)
Douglas J. Dixon (ddixon@irell.com)

Ellisen S. Turner (eturner@irell.com)
Benjamin Haber (bhaber@irell.com)
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone: (310) 277-1010
Facsimile: (310) 203-7199

*Attorneys for Defendant and Counterclaimant T-MOBILE USA, INC.*

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 2

A. The Asserted Patent And Its Claims. .......... 2

B. Dr. Apsel's Infringement Report .......... 3

1. Dr. Apsel's report provides little analysis and few substantive opinions. .......... 3

2. Dr. Apsel's report accuses at least eight *different* "NFC phones" from four *different* manufacturers, with no separate analysis for any of them. .......... 4

3. Dr. Apsel opines that infringement requires analyzing specific components used in the NFC phones and SWP SIM Cards, but she speculates on which components they include. .......... 5

4. Dr. Apsel lacks any actual expertise or experience with the products. .......... 6

5. Dr. Apsel did not examine physical samples of any of the accused products to determine how they function. .......... 6

6. Dr. Apsel did not review any technical information sufficient to show the accused products' circuitry or programing. .......... 7

7. The report provides only Dr. Apsel's speculative "belief" regarding critical claim elements. .......... 8

III. LEGAL STANDARDS .......... 8

A. A Court Must Act As A Gatekeeper, Excluding Irrelevant And Unreliable Opinions. .......... 8

B. Conclusory and Unsupported Expert Opinions Are Unreliable And Must Be Excluded. .......... 10

IV. ARGUMENT .......... 11

A. To Reach Any Reliable Infringement Opinion, Dr. Apsel Was First Required To Analyze The Accused Products' Circuitry And Programming .......... 11

1. The parties agree that the "fixedly connected" limitation precludes using a switching element .......... 11

**Page**

2. The claimed "semiconductor device" must not have a switching element. ....... 12

3. The claims require that the antenna interface must be coupled to multiple other components. ....... 15

4. Claim 25 requires a semiconductor device that is programmed in a particular way. ....... 16

B. Dr. Apsel's Conclusory And Speculative "Beliefs" On Infringement Are Unreliable, Lack Evidentiary Support, And Must Be Excluded. ....... 16

1. Dr. Apsel's opinions are based on her own unsupported "belief" and speculation. ....... 17

2. Dr. Apsel ignored relevant evidence in favor of baseless and unreliable assumptions. ....... 20

3. Dr. Apsel's opinions may also be stricken as irrelevant because they fail to create a genuine issue for trial. ....... 22

4. Dr. Apsel's failure to analyze each accused product renders her opinions unreliable. ....... 23

V. CONCLUSION ....... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allstate Insurance Co. v. Hamilton Beach/Proctor Silex, Inc.*,
473 F.3d 450 (2d Cir. 2007) ..... 19

*Amorgianos v. AMRTRAK*,
303 F.3d 256 (2d Cir. 2002) ..... 9, 10, 20

*Arista Records LLC v. Usenet.com*,
608 F. Supp. 2d 409 (S.D.N.Y. 2009) ..... 21

*Arjangrad v. JPMorgan Chase Bank, N.A.*,
No. 3:10-cv-01157-PK, 2012 WL 1890372 (D. Or. May 23, 2012) ..... 21

*Arthur A. Collins, Inc. v. Northern Telecom Ltd.*,
216 F.3d 1042 (Fed. Cir. 2000) ..... 22

*Bickerstaff v. Vassar Coll.*,
196 F.3d 435 (2d Cir. 1999) ..... 8

*Bourjaily v. United States*,
483 U.S. 171 (1987) ..... 8

*Brooks v. Outboard Marine Corp.*,
234 F.3d 89 (2d Cir. 2000) ..... 19

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
239 F.3d 179 (2d Cir. 2001) ..... 9

*Colon ex rel. Molina v. BIC USA, Inc.*,
199 F. Supp. 2d 53 (S.D.N.Y. 2001) ..... 17

*Cooper v. Marten Transport, Ltd.*,
2013 WL 5381152 (11th Cir. Sept. 27, 2013) ..... 18

*Country Rd. Music, Inc. v. MP3.com, Inc.*,
279 F.Supp.2d 325 (S.D.N.Y. 2007) ..... 10, 19

*Cummins v. Lyle Indus.*,
93 F.3d 362 (7th Cir. 1996) ..... 18

*Damon v. Sun Co., Inc.*,
87 F.3d 1467 (1st Cir. 1996) ..... 10

*DataQuill Ltd. v. Handspring, Inc.*,
No. 01 C 4635, 2003 WL 737785 (N.D. Ill. Feb. 28, 2003) ..... 21

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ..... 10

**Page(s)**

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................ passim

*DSU Med. Corp. v. JMS Co.*,
296 F. Supp. 2d 1140 (N.D. Cal. 2003) ........................................ 10

*Dynacore Holdings Corp. v. U.S. Philips Corp.*,
363 F.3d 1263 (Fed. Cir. 2004) ........................................ 22

*Fujitsu Ltd. v. Netgear*,
620 F.3d 1321 (Fed. Cir. 2010) ("*Fujitsu II*") ........................................ 23, 24

*Fujitsu Ltd. v. Netgear, Inc.*, No. 07-cv-710,
2009 WL 3047616 (W.D. Wis. Sept. 18, 2009) ("*Fujitsu I*") ........................................ 23

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........................................ 10

*Hollander v. American Cyanamid Co.*,
172 F.3d 192 (2d Cir. 1999) ........................................ 9

*In re Omeprazole Patent Litigation*,
490 F.Supp.2d 381 (S.D.N.Y. 2007) ........................................ 20

*Intellectual Science and Technology, Inc. v. Sony Electronics, Inc.*,
589 F.3d 1179 (Fed. Cir. 2009) ........................................ 22

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........................................ 9, 11

*Leveraged Innovations v. NASDAQ Omx Group*,
No. 11-CV-3203, 2012 WL 4062100 (S.D.N.Y. Sept. 14, 2012) ........................................ 10, 19

*Lockwood v. Am. Airlines, Inc.*,
107 F.3d 1565 (Fed. Cir. 1997) ........................................ 22

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........................................ 9

*Lynch v. Trek Bicycle Corp.*,
374 Fed. Appx. 204 (2d Cir. 2010) ........................................ 19

*Major League Baseball Props. v. Salvino, Inc.*,
542 F.3d 290 (2d. Cir. 2008) ........................................ 22

*Mannion v. Coors Brewing Co.*,
No. 04 Civ. 1187, 2007 WL 3340925 (S.D.N.Y. Nov. 7, 2007) ........................................ 18

*Medtronic v. Mirowski*,
___U.S. ____, 134 S.Ct. 843 (2014) ........................................ 12, 15

*Microsoft Corp. v. Datatern*,
Nos. 11-CV-2365 & -2648, 2012 WL 3682915 (S.D.N.Y. Aug. 24, 2012) ........................................ 10

**Page(s)**

*Milos Misha Subotincic v. Ontario Inc.*,
No. 10-01946 AG, 2013 WL 3964994 (C.D. Cal. Apr. 9, 2013) .................................... 22

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005)........................................................................................... 20

*Power Integrations v. Fairchild Semiconductor*,
711 F.3d 1348 (Fed. Cir. 2013)....................................................................................... 16

*Ruggiero v. Warner–Lambert Co.*,
424 F.3d 249 (2d Cir. 2005)........................................................................................... 20

*Smith v. Pac. Bell Tel. Co.*,
649 F. Supp. 2d 1073 (E.D. Cal. 2009).......................................................................... 21

*Source Vagabond Systems, Ltd. v. Hydrapak, Inc.*,
No. 1:11-cv-05379, 2012 WL 1223928 (S.D.N.Y. Apr. 11, 2012)................................. 17

*Under Sea Industries, Inc. v. Dacor Corp.*,
833 F. 2d 1551 (Fed. Cir. 1987)................................................................................ 12, 15

WiAV Networks, LLC v. 3Com Corp.,
No. C 10–03448, 2010 WL 3895047 (N.D. Cal. Oct. 1, 2010)................................. 23, 24

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,
No. 09-157-RGA, 2013 WL 865974 (D. Del. Mar. 7, 2013) ......................................... 22

*Zelinski v. Brunswick Corp.*,
185 F.3d 1311 (Fed. Cir. 1999)....................................................................................... 22

**Other Authorities**

FED. R. EVID. 104(A)........................................................................................................ 8

FED. R. EVID. 401............................................................................................................. 9

FED. R. EVID. 702............................................................................................... 9, 10, 20

## I.    INTRODUCTION

T-Mobile moves to prohibit OTI from introducing at trial any opinions, testimony, or argument based upon Dr. Alyssa Apsel's November 4, 2013 expert report regarding infringement. The report's opinions are so conclusory, so lacking in any reliable evidentiary support or analyses, that they must be excluded.

The report purports to conclude that at least eight different mobile phones, made by four completely different non-party manufacturers, infringe multiple claims in OTI's patent. The report's infringement conclusion depends on these eight phones containing an SWP SIM card and other specific components, all of which are made by yet another set of separate non-parties.

Under the Court's claim construction, to properly determine whether these non-parties opted to include the particular switchless circuit design claimed in OTI's patents would have required an expert to review detailed information regarding the circuitry used within each phone's components, the circuitry used to interconnect those components with each other and with the SWP SIM card, and how a microprocessor within that card was programmed. But Dr. Apsel had none of this information. Dr. Apsel never reviewed a single document from any of the four phone manufacturers in reaching her infringement conclusions. She never saw, let alone analyzed, any physical samples of the accused products or their components for infringement and has never seen any detailed circuit diagrams or source code for any of them.

Lacking any reliable evidence, Dr. Apsel merely states in conclusory fashion that she "believes" and "imagines" that the products satisfy certain key claim elements. She includes in her rank speculation unsupported conclusions regarding critical claim elements. Dr. Apsel lacks any evidence to support her naked "beliefs" and has no experience with the accused products or their components sufficient to fill the wide analytical and evidentiary gaps in her opinions.

The report concludes with an eight-page "infringement analysis" that contains a single, five-page claim chart in which Dr. Apsel lumps all eight phones and their distinct components together for purposes of her "analysis." She never provides any supportable rationale for her

apparent decision to treat them all as identical. Worse yet, although her infringement opinions depend on the precise components used within the accused products, Dr. Apsel had no reliable information to show exactly which components they contain and simply opines that she "understands" they contain certain components.

Dr. Apsel's report lacks the most basic requirement for an admissible expert opinion regarding infringement—sufficient technical information and analyses concerning the accused products. The Court should exercise its gatekeeping function tp exclude Dr. Apsel's conclusory opinions from trial.

## II.     BACKGROUND

### A.     The Asserted Patent And Its Claims.

OTI accuses T-Mobile of infringing claims 1, 2, 12, 24, and 25 of U.S. Patent No. 6,045,043 (the "asserted claims" of the "'043 patent"). Ex. 1 p. 37 ¶ 85; Dkt. No. 118 ¶ 11.  The technology relates to circuitry and programming for devices that use two different communication modes:  a contact mode that uses only direct electrical connections, and a contactless mode that communicates wirelessly using antennas. The '043 Patent describes circuitry for one such device—a "contact/contactless data transaction card" in the form of a smart card. Ex. 5. The patent "deals with connecting a microprocessor with both the contact and contactless modes of communication through separate, dedicated lines of connection." Dkt. No. 52 (Claim Construction Order) p. 3.

Claim 1 is the '043 patent's only independent claim. That claim, reproduced below, requires a specific circuit layout for the data transaction card, including at least four specified components interconnected and operating in a specific way:

> **1.** A data transaction card having contact and contactless modes of operation, comprising:
>
> [a] a <u>semiconductor device</u> for operating in said contact and contactless modes in accordance with a respective contact or contactless data communications protocol,
>
> [b] a <u>contact field including contacts fixedly connected to the semiconductor device</u> during both said contact and contactless modes, and allowing

data transmission between the contacts and the semiconductor device in accordance with said contact data communications protocol only during said contact mode,

[c] an antenna coil for allowing contactless data transmission between the antenna coil and the semiconductor device, in accordance with said contactless data communications protocol, and

[d] an antenna interface coupled to the antenna coil, to the semiconductor device and to at least some of the contacts in the contact field and being responsive to an electromagnetic field across the coil for effecting said contactless data transmission.

Ex. 5 at 13:38-58 (emphasis added). Importantly, as discussed in more detail in Section IV.A below, at least the "semiconductor device" and "fixedly connected" limitations preclude using any switching element in the path for the contact and contactless data. OTI has repeatedly argued, and this Court as already found, that the '043 patent claims require "a specific layout for a device" and exclude from their scope any device where the circuitry includes a switching mechanism to control the flow of the contact and contactless data. Dkt. No. 52 at 3, 19.

In addition to these elements from claim 1, the patent's dependent claims require, among other things, separate contact and contactless i/o ports for effecting data transmission according to each protocol (claim 2), bi-directional communication (claim 12), using a standard called ISO 7816 for the contact data communications protocol (claim 24), and programming the semiconductor device in a specified way (claim 25). Ex. 5 at 13:59-63, 14:6-7, 16:43-51.

### B. Dr. Apsel's Infringement Report

#### 1. Dr. Apsel's report provides little analysis and few substantive opinions.

OTI's infringement expert, Dr. Alyssa Apsel, submitted her report on November 4, 2013. Ex. 1. Dr. Apsel's report, including all of its filler, spans a mere 37 pages. Her "infringement analysis" is provided in the report's penultimate section, which includes only eight pages. Ex. 1 pp. 29-36. Of these, only five pages constitute Dr. Apsel's entire claim charts for all eight accused products and all five asserted claims. Ex. 1 pp. 32-36. Two of the eight pages do not address infringement at all and instead provide Dr. Apsel's opinions regarding alleged

shortcomings in the available non-infringing alternatives. Ex. 1 pp. 30-31 ¶ 83. The report's final page merely provides Dr. Apsel's signature along with a naked conclusion that the products infringe the asserted claims. Ex. 1 p. 37 ¶ 85.

Of the report's remaining 29 pages, five merely recite Dr. Apsel's background and qualifications, list the 18 documents that she relied on in forming her opinions, and discuss her views on the "legal principles of infringement." Ex. 1. pp. 1-5. The other 24 pages purport to provide an "overview of T-Mobile's NFC Technology" but consist almost entirely of large block quotes, block diagrams, and paraphrased text from various documents and deposition testimony interspersed with a few statements and annotations for which Dr. Apsel provides no citation or supporting evidence. Ex. 1 pp. 5-28.

**2. Dr. Apsel's report accuses at least eight *different* "NFC phones" from four *different* manufacturers, with no separate analysis for any of them.**

Although Dr. Apsel's report vaguely references "all of T-Mobile's Isis-compatible phones," the only specific phones that she purports to address are the below eight different "NFC phones" from four completely different manufacturers. Ex. 1 p. 29 ¶ 81.[1]

| Samsung | HTC | LG | Sony |
|---|---|---|---|
| Galaxy 2, 3, and S4<br>Relay G<br>Note II | HTC One | F6 | Xperia Z |

The report does not do anything more than list these specific phones—it never relies upon or discusses any technical documents for any specific phones. Other than this bare list, no information on any specific phones is ever discussed or analyzed anywhere in her report.

[1] OTI's Amended Complaint adds four additional non-party products that Dr. Apsel never referenced in any expert report—the LG G2, Samsung Galaxy S3 LTE, Samsung Galaxy Light, and Samsung Note 3. Dkt. No. 118 ¶ 9.

**3. Dr. Apsel opines that infringement requires analyzing specific components used in the NFC phones and SWP SIM Cards, but she speculates on which components they include.**

Dr. Apsel opines that the phones referenced in her report infringe the asserted claims in certain circumstances when they are combined with an SWP SIM card. Ex. 1 pp. 2 ¶ 5, 32 ¶ 84.[2] The only specific SWP SIM card manufacturer that Dr. Apsel's report references is Gemalto. But she does not identify any specific Gemalto products in the body of her report. Instead, she simply says that she "understand[s] that the UICC used in T-Mobile's phones is manufactured by Gemalto" and attaches as an exhibit a series of Gemalto data sheets for various Gemalto products. Ex. 1 p. 18 ¶ 44 (emphasis added); Ex. 1 at Appendix B (listing as Dr. Apsel's Exhibit 16 the "Gemalto UpTeq Mobile NFC 2.0 data sheets"). Although attached as exhibits, the Gemalto data sheets are never once mentioned or described, let alone analyzed, anywhere in the body of Dr. Apsel's report or claim charts other than to merely say that they were "considered" along with the 17 other documents Dr. Apsel reviewed. Ex. 1 pp. 2-4 ¶ 6 (list of documents "considered" includes the Gemalto data sheets as item 16).

Dr. Apsel opines that she "understands" that these unspecified Gemalto SWP SIM cards include a microprocessor that is contained within some version of a microcontroller made by a company called STMicroelectronics. Ex. 1 p. 18-19 ¶ 44 (emphasis added), p. 16-17 ¶ 39. She provides no basis for that understanding and does not know which specific STMicroelectronics microcontroller is actually used in any specific Gemalto SWP SIM card. Ex. 1 p. 18-19 ¶ 44 (opining that Dr. Apsel "understands" that an unspecified Gemalto product contains an "STMicroelectronics' ST33F1M (or a variant thereof having 512kb memory).").

Dr. Apsel's infringement opinions also require that the accused NFC phones contain an "NFC controller" and antenna coil. Ex. 1 p. 24 ¶ 62. She opines that "[a]ll but one of T-Mobile's NFC phones use an NFC controller manufactured by NXP called the PN544; the Samsung Galaxy S4 uses a Broadcom chip." Ex. 1 p. 25 ¶ 63. Although she cites testimony from a T-

[2] Dr. Apsel also refers to a SIM card as a Universal Integrated Circuit Card (UICC). *See, e.g.*, Ex. 1 p. 15 ¶ 36.

Mobile witness to support that opinion, the witness actually testified that he does not know whether the phones contain the PN 544 and Dr. Apsel provides no other basis for her conclusion. Ex. 1 p. 25 ¶ 63 & n37; Ex. 4 (Silis Depo. Tr.) at 63:8-16 ("**Q.** Is that the PN 544? **A.** I would not – I don't know."). Her report never identifies any particular Broadcom chip used in the Samsung Galaxy S4 and provides no analysis regarding any such chip.

**4. Dr. Apsel lacks any actual expertise or experience with the products.**

Beyond her generalized knowledge of electronics as an electrical engineering professor, Dr. Apsel has no particular expertise or experience with the accused products or their components. She admits that "[m]obile phones are complicated systems" and that she is not an expert on every aspect of mobile phones. Ex. 2 (Apsel Depo Tr.) at 241:17-25. Indeed, she was unable to list any specific mobile phone on which she was an expert for any topic whatsoever. *Id.* at 242:2-23. Dr. Apsel has not designed any technology that has ever been implemented in any commercial mobile phone or smart card. *Id.* at 69:16-24. She has never done any work in the smart card industry. *Id.* at 64:25-65:3. She has never worked with any STMicroelectronics microcontrollers for smart cards. *Id.* at 60:10-18. In her entire professional career, she has never worked with any of the microcontrollers involved in this suit. *Id.* at 60:19-70:3.

Dr. Apsel also lacks any relevant experience with the various standards involved in this lawsuit. She has never done any work on any mobile wallet software and has never had any experience working with any NFC standards. *Id.* at 65:9-16. She has not been involved in the development of any ISO standards and has never designed any devices that used the ISO 7816 standard allegedly used in the accused products. *Id.* at 67:20-22, 75:2-5.

**5. Dr. Apsel did not examine physical samples of any of the accused products to determine how they function.**

Dr. Apsel has not physically examined the accused products, or any electronic circuits within them, to determine how the products operate. Ex. 2 (Apsel Depo. Tr.) at 60:3-6. She has not done any reverse engineering of any of the accused products—not the phones and not the SWP SIM cards. *Id.* at 59:12-60:9. She has not seen any physical sample of the

STMicroelectronics microcontroller. *Id.* at 155:2-7. Indeed, she is not sure whether she has seen physical samples of any of the accused products. Although she thinks she may have seen a phone at some point during this case, she does not remember what phone it was and it may not have been one of the accused phones. *Id.* at 199:20-200:9.

#### 6. Dr. Apsel did not review any technical information sufficient to show the accused products' circuitry or programing.

Dr. Apsel's report lists all 18 of the documents that she relied upon in forming her infringement conclusions. Ex. 1 pp. 2-4. Not a single Samsung, LG, Sony, or HTC document is included amongst them. *Id.* Although she opined that one of the Samsung phones uses an NFC controller chip that Broadcom manufactures, she did not identify that product and did not review or analyze any Broadcom documents. *Id.* p. 25 ¶ 63. Only one T-Mobile document is referenced in the entire list and it provides no details or requirements regarding the circuitry design or layout within any of the accused products. *Id.* p. 3 (item 12).

Dr. Apsel has not seen any internal drawings or schematics that depict the internal wiring or circuitry in the accused products. Ex. 2 (Apsel Depo. Tr.) at 146:22-147:5. She has not seen circuit schematics for any of the products or their components and has not seen physical layouts[3] for any of them. *Id.* at 175:13-21; 310:11-311:11. The few black-box block diagrams that she reviewed do not show the circuitry used to implement the various blocks and do not show the circuitry used to implement the interconnections between each block. *Id.* at 165:19-166:19. Indeed, the figures that she relies upon do not show electrical components at all. *Id.* at 166:20-24. There is more than one way to implement the functions depicted in the block diagrams that she relies upon. *Id.* at 166:25-168:16. In circuitry for the accused products, it is likely that millions of transistors are used to implement the SWP SIM cards alone. *Id.* at 170:18-172:14.

[3] Dr. Apsel explained that a circuit schematic shows the transistors, gates, and other logic used to implement the product, while the physical layout provides sufficiently detailed information to actually fabricate the product. Ex. 2 at 173:14-174:9.

**7. The report provides only Dr. Apsel's speculative "belief" regarding critical claim elements.**

Dr. Apsel confirms in her report that she has "not been provided with detailed schematics of the internal connections of the UICC" and that she has therefore based her opinions on her personal "belief" about the products and her lack of awareness concerning their internal circuitry:

> Although I have not been provided with detailed schematics of the internal connections of the UICC, I believe the external contact pins (e.g., C6, C7, etc.) are fixedly connected to the microprocessor inside the UICC; that is, I am not aware of any switching mechanism by which a signal on the contacts will not be provided to the inputs to the microprocessor inside the UICC.

Ex. 1 p. 17 (emphasis added).

Similarly, Dr. Apsel's report confirms that she has "not been presented with detailed schematics of the [STMicroelectronics ST33F1M microcontroller]" and she has therefore based her opinions on how she personally "believes" it is programmed although she has never, ever worked with that product. Ex. 1 p. 19 ¶ 44 ("Although I have not been presented with detailed schematics of the ST33F1M, I believe it is programmed to relate to the data on both data lines simultaneously according to the respective protocol.") (emphasis added); Ex. 2 at 60:10-70:3. Further, Dr. Apsel admitted that although she has seen a non-detailed, black-box block diagram for the functional components within the microcontrollers, she does not know how the blocks within that diagram are actually implemented, would have to "guess," and would need to see a circuit diagram to know the technical detail. Ex. 2 at 152:25-153:20.

## III. LEGAL STANDARDS

### A. A Court Must Act As A Gatekeeper, Excluding Irrelevant And Unreliable Opinions.

OTI, as the proponent of expert evidence, must bear the initial burden of establishing admissibility by a "preponderance of proof." *See Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987) (discussing FED. R. EVID. 104(a)); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 & n.10 (1993) (citing *Bourjaily*, 483 U.S. at 175-76). In evaluating that proof, a court must act as "'a gatekeeper to exclude invalid and unreliable expert testimony.'" *Bickerstaff v.*

*Vassar Coll.*, 196 F.3d 435, 449 (2d Cir. 1999) (quoting *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 202 (2d Cir. 1999)); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Louis Vuitton Malletier v. Dooney & Bourke, Inc.* ("Vuitton IV"), 525 F. Supp. 2d 558, 561-65 (S.D.N.Y. 2007) (discussing district court's "special obligation" to gatekeep with respect to expert evidence). In performing this task, Federal Rule of Evidence 702 and *Daubert* "assign[] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" and, if not, the testimony must be excluded." *Daubert*, 509 U.S. at 589, 592-93, 597; *Kumho Tire*, 526 U.S. at 147-49.

Rule 702 requires that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702; *see Daubert*, 509 U.S. at 598.

It is thus a court's responsibility as gatekeeper to first determine whether the testimony "is relevant, *i.e.*, whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting FED. R. EVID. 401). Second, the court must ensure the opinions are reliable—to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). To meet this standard, every step of an expert's analysis must be reliable. *See Amorgianos v. AMTRAK*, 303 F.3d 256, 267 (2d Cir. 2002). The court "should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id*.

### B. Conclusory and Unsupported Expert Opinions Are Unreliable And Must Be Excluded.

Expert testimony must be "based on sufficient facts or data." Fed. R. Evid. 702 (b). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Amorgianos*, 303 F.3d at 267 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "[A]n expert should not be permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (quotations omitted).

Expert testimony that consists of conclusory opinions, supported by no explanation or analysis beyond an expert's say-so, should be excluded under *Daubert* as unreliable. "[A] court should not consider an expert's mere conclusory statements without analytical basis." *Leveraged Innovations v. NASDAQ Omx Group*, No. 11-CV-3203, 2012 WL 4062100 at *5 (S.D.N.Y. Sept. 14, 2012) (citing *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F.Supp.2d 325, 330 (S.D.N.Y. 2007) ("Where an expert's opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached or assumptions that represent a complete break with the evidence in the record, it should be excluded … .") (citations and quotations omitted)).[4]

Further, if an expert is "relying solely or primarily on experience," Rule 702's reliability standard requires the expert to "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." FED. R. EVID. 702 advisory committee's note (2000 Amendment). An expert's assertion of a conclusion and assurance that it is reliable is "not enough." *Daubert v. Merrell Dow Pharms., Inc. ("Daubert II")*, 43 F.3d 1311, 1319 (9th Cir. 1995). An expert

[4] *See also Microsoft Corp. v. Datatern*, Nos. 11-CV-2365 & -2648, 2012 WL 3682915 at *3 (S.D.N.Y. Aug. 24, 2012) ("a court should not consider mere ipse dixit of an expert — that is, conclusory statements without analytical basis."); *Arista Records LLC v. Usenet.com*, 608 F. Supp. 2d 409,423 (S.D.N.Y. 2009) ("Expert testimony should be excluded if it is speculative or conjectural or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith.") (citations and quotations omitted).

cannot assume that her personal experiences reliably explain a subject without providing a cogent explanation of why and how that is so. Instead, the court's objective when exercising its gatekeeping function is to "make certain" that an expert's testimony is reliable and not a conclusory belief that one parties' position is correct. *Kumho Tire Co.*, 526 U.S. at 152.

## IV.    ARGUMENT

Essential elements in the asserted claims require that an accused product have a specific circuit design and layout and be programmed in a particular way. To show infringement, Dr. Apsel was therefore required to assess detailed technical information regarding the accused products to demonstrate that these claims were met on a product-by-product basis. But she completely failed to undertake that analysis. Instead, she improperly bases her infringement conclusion on her speculative "beliefs" and "imagination" regarding products that she has no experience with and has never even seen. The law does not permit such conclusory and unreliable opinions to go to the jury.

### A.    To Reach Any Reliable Infringement Opinion, Dr. Apsel Was First Required To Analyze The Accused Products' Circuitry And Programming.

Numerous word and phrases in the asserted claims have been construed to carry particular meanings, many of which required Dr. Apsel to identify, inspect, and evaluate the specific circuit design, circuit layout, and programming within the accused products.

#### 1.    The parties agree that the "fixedly connected" limitation precludes using a switching element.

The parties agree that the "fixedly connected" element in the claims includes a negative limitation that precludes using a switching element. For example, Dr. Apsel has opined that "[i]n the context of claim 1, 'fixedly connected' means <u>lacking an intermediate switch</u> in the data path, specifically between the contacts and the microprocessor." Ex. 3 p. 11 ¶ 38 (emphasis added). Thus, to infringe, a product must at the very least not have any switching element in that path. It

is OTI's burden to show that this claim element is met by demonstrating the absence of any such switching element.[5]

As Dr. Apsel has opined, however, such a switching element could be implemented in a wide variety of ways, including by simply adding a multiplexor, using a bus, or using a buffer (temporary storage) and switching out the buffer's output. Ex. 2 at 245:4-249:13; 262:2-4, 264:12-23. Further, Dr. Apsel has also opined that the "fixedly connected" limitation requires direct coupling such that any intervening circuit, whether or not it is a switching element, would prevent contacts from being "fixedly connected" to the semiconductor device. Ex. 2 at 267:18-268:16, 268:17-22. Therefore, a proper infringement opinion would require tracing a circuit path that lacks any intervening components and lacks anything that constitutes a switching element. Dr. Apsel has not even attempted to do that in her "analysis." *See* Section II.B.6, *supra*.

Contrary to Dr. Apsel's own proposed construction, OTI now appears to argue that it can ignore the portion of the data path that runs from any contacts on the Gemalto SWP SIM card to the microprocessor within the STMicroelectronics microcontroller allegedly inside that card. OTI is wrong for all the reasons discussed below. But even if OTI could support that argument, Dr. Apsel's opinions would need to be excluded because, in addition to ignoring the data paths inside the SWP SIM card, Dr. Apsel also failed to analyze the circuitry for the data paths between the SWP SIM card and the other components in each accused phone.

### 2. The claimed "semiconductor device" must not have a switching element.

OTI now argues that the semiconductor device can include switching elements along the path that carries contact and contactless data to the product's microprocessor, if that microprocessor is inside another object that can also be called a semiconductor device. That

[5] "[T]he patentee, not the accused infringer, bears the burden of proving infringement" and supporting its infringement theories with evidence. *Medtronic v. Mirowski*, ___U.S. ____, 134 S.Ct. 843, 846-47 (2014); *Under Sea Industries, Inc. v. Dacor Corp.*, 833 F. 2d 1551, 1557 (Fed. Cir. 1987) ("The burden always is on the patentee to show infringement"). OTI cannot shift this burden by submitting a mere conclusory opinion that claim elements are met and forcing T-Mobile to prove otherwise.

argument is contrary to the Court's claim construction order, the patent, the prosecution history, the inventor testimony, and OTI's own expert's oft-stated opinions. The Court has already found that the '043 patent claims exclude from their scope any device where the circuit layout includes a switching element to control the flow of the contact and contactless data. Dkt. 52 at 19 (finding that during patent prosecution "OTI sought to make clear that it was seeking to patent a specific layout for a device, <u>one that did not involve a switching mechanism</u>.") (emphasis added). The Court further found that the patent's distinction from the primary prior art was that "the '043 patent <u>obviates the need to use a switching device</u> … to connect the microprocessor with both the contact and contactless sources of data" *Id.* at 3 (emphasis added). Therefore, the claimed semiconductor device cannot include a switching element on the data path to the device's microprocessor because the prior art included semiconductor devices with a switching element in precisely that location.

Dr. Apsel's own proposed claim interpretation as well as the intrinsic evidence are in accord. For example, Dr. Apsel testified that the asserted claims preclude using a switching element between the contacts and the product's microprocessor as well as between the contacts and any putative semiconductor device. Ex. 2 at 139:12-18 ("**Q.** Do the claims preclude using a ·switching element between the contacts and the microprocessor? **A.** <repeating the question verbatim> I believe they do."); 244:7-11 ("Q. Your construction of fixedly connected requires there be no switching element between the contacts and the semiconductor device, correct? ·**A.** That's correct."). During claim construction, Dr. Apsel repeatedly emphasized the lack of any switching element. For example, Dr. Apsel advocated that "[r]eading a switching mechanism back into the device would contradict both the file history and the patent itself." Ex. 6 p. 9 ¶ 31. Dr. Apsel thus acknowledges what both the "patent itself" and the "file history" demonstrate—the '043 patent does not cover devices that include a switching element.

That conclusion accords with the evidence. The '043 patent and its inventors expressly distinguished the prior art on the grounds that the "invention" lacks a switching element. *See, e.g.,* Ex. 11 at 62:24-64:22, 83:6-11. For example, Figure 1 of the patent is labeled as "prior art"

and prominently includes a "switching element." But Figure 2 just below it then depicts an embodiment of the claimed invention where the semiconductor device has a "microprocessor" and, notably, removes the switching element from the data path to that microprocessor:

Ex. 5 at 3:53-4:10 and Figs. 1 & 2; *see also, e.g.*, Ex. 7 (Aduk (inventor) Depo. Tr.) at 44:17-21 ("**Q.** Okay. And if you look below figure 1 at figure 2, there is no switching element device, is that right? **A.** As I see the figure 2, there is no switching here").

Moreover, the '043 patent attempts to distinguish a prior art patent (Kreft '495) that includes in its Figure 2 a card where the semiconductor device contains a switching element:

Ex. 10 at Fig. 2 and 3:11-17 (explaining that the "semiconductor device **2** preferably comprises both a switching element device **2.1** and microcomputer **2.2** with arithmetic unit and memory");

*see also* Ex. 11 at 114:5-24, 130:8-133:3. Hence, the ’043 patent disclaimed configurations where there was a switching element in the data path for contact and contactless data even within the semiconductor device. Ex. 5 at 1:25-63, 4:5-10 (distinguishing the Kreft ’495 patent due to its switching element).

The Court’s claim constructions, OTI’s own proposed constructions and expert opinions, and the patent itself all lead to one inescapable conclusion—the claims preclude using a switching element anywhere in the product’s data path for the contact and contactless data, whether inside or outside the semiconductor device. But even if one only adopted OTI’s own newly proposed claim construction for the “fixedly connected” claim element, Dr. Apsel’s infringement opinions must be excluded because she fails to reliably support her conclusory opinion that the products contain no switching elements in the data path between the contacts and the microprocessor in the accused products.

**3. The claims require that the antenna interface must be coupled to multiple other components.**

The lack of a switching element is not the only claim feature that requires reviewing and analyzing the circuit layout within each accused product. Claim 1 also requires an “antenna interface coupled to the antenna coil, to the semiconductor device and to at least some of the contacts in the contact field” in the product. Ex. 5 at 13:54-58. According to Dr. Apsel, if there is “any circuit that prevents a direct connection,” then the two components in question “were not coupled.” Ex. 2 at 267:18-268:16. Therefore, a proper infringement opinion would require tracing the circuit paths connecting each of the components specified in this claim element to confirm that no circuit is interposed between them. More than that, under Dr. Apsel’s own opinions, OTI would need to show that no such interposed circuit changed the nature of the signal, even by simply inverting it. Ex. 2 at 81:14-82:13. That is OTI’s burden. *Medtronic*, ___U.S. ____, 134 S.Ct. at 846-47; *Under Sea Industries*, 833 F. 2d at 1557. But Dr. Apsel has not even attempted to perform the required analysis. *See* Section II.B.6, *supra*.

**4. Claim 25 requires a semiconductor device that is programmed in a particular way.**

Dependent claim 25 adds the following requirements for programming the semiconductor device:

> **25.** The data transaction device according to claim 2, wherein data may be present on the contact and contactless i/o ports simultaneously, and the semiconductor device is <u>programmed to relate to the data on only one of the data lines or on both data lines simultaneously according to a predetermined protocol</u>**.**

Ex. 5 at 16:46-51 (emphasis added). Dr. Apsel has opined that the term "relate to" within claim 25 means "process." Ex. 3 p. 13 ¶ 44 ("I believe the plain an ordinary meaning of 'relate to' to anyone of ordinary skill in the art is 'process.' … I believe one of ordinary skill in the art would understand this to mean that that the microprocessor can be programmed to process the data accordingly."). Under this view, a proper infringement opinion would require examining the program code running on a microprocessor in the accused products to confirm that it is programmed the way that the claim requires. Dr. Apsel has never seen any such computer code and has not ever attempted to analyze any such code. Ex. 1 p. 19 ¶ 44; Ex. 2 at 176:3-6.

**B. Dr. Apsel's Conclusory And Speculative "Beliefs" On Infringement Are Unreliable, Lack Evidentiary Support, And Must Be Excluded.**

This is a suit for patent infringement in which it is the infringement expert's burden to show, by a preponderance of the evidence, that each accused product practices all the elements in the asserted claims. But for multiple, critical claim elements, all Dr. Apsel has provided are conclusory opinions, derived from incomplete and unreliable data, and built on speculation. "Such unreliable testimony frustrates a primary goal of expert testimony in any case, which is meant to place experience from professional specialization at the jury's disposal, not muddle the jury's fact-finding with unreliability and speculation." *Power Integrations v. Fairchild Semiconductor*, 711 F.3d 1348, 1374 (Fed. Cir. 2013).

**1. Dr. Apsel's opinions are based on her own unsupported "belief" and speculation.**

As the evidence cited in Section II.B.6 above demonstrates, Dr. Apsel did not ever see, let alone analyze, any materials that showed the electronic layout for the relevant aspects of the accused products and she did not review a single technical document from any phone's manufacturer.[6] Further, she has not analyzed or even seen any physical samples of the products accused in her expert report. Ex. 2 (Apsel Depo. Tr.) at 59:12-60:9, 155:2-7, 197:20-200:9. Dr. Apsel has therefore admitted, as she must, that her infringement opinions are based on her own speculative beliefs and she has no evidence from which to reliably conclude (a) whether or not the accused products lack switching elements as all the claims require, or (b) whether the accused products were programmed in the manner that claim 25 requires.

For example, Dr. Apsel states,

- "Although <u>I have not been provided with detailed schematics of the internal connections</u> of the UICC, <u>I believe</u> the external contact pins … are fixedly connected to the microprocessor inside the UICC; that is, <u>I am not aware of any switching mechanism</u> by which a signal on the contacts will not be provided to the inputs to the microprocessor inside the UICC." Ex. 1 p. 17 (emphasis added)
- "Although <u>I have not been presented with detailed schematics</u> of the ST33F1M, <u>I believe</u> it is programmed to relate to the data on both lines simultaneously according to the respective protocol." Ex. 1 p. 19 ¶ 44 (emphasis added).

Dr. Apsel offers no testable support for these conclusions; instead, merely offering her proclamation, which is improper. *See Daubert*, 509 U.S. at 592-94 (conclusory statements that cannot reasonably be assessed for reliability should be excluded).[7] This sort of transparent guesswork is incompetent to pass *Daubert's* gate. "Guesswork, even educated hunches by qualified experts, is not enough. The evidence must be genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Colon ex rel. Molina v. BIC USA*,

[6] T-Mobile does not design or make the NFC phones or SWP SIM cards at issue here and hence did not possess such this information.

[7] In addition to being unreliable, patent infringement contentions that lack supporting evidence are sanctionable. *Source Vagabond Systems, Ltd. v. Hydrapak, Inc.*, No. 1:11-cv-05379, 2012 WL 1223928, at *7 (S.D.N.Y. Apr. 11, 2012) (imposing sanctions for asserting infringement claims that "lacked evidentiary support").

*Inc.*, 199 F. Supp. 2d 53, 75 (S.D.N.Y. 2001) (quoting *Cummins v. Lyle Indus.*, 93 F.3d 362 (7th Cir. 1996). Further, the courts in this district "do not accept that [a] lack of necessary information justifies receipt into evidence of [the expert's] best guess in its absence…The lack of appropriate data, whatever the reason, does not justify the receipt in evidence of unreliable, unsubstantiated expert testimony." *Mannion v. Coors Brewing Co.*, No. 04 Civ. 1187, 2007 WL 3340925 at *4–5 (S.D.N.Y. Nov. 7, 2007).

Dr. Apsel also lacks the actual experience with the accused products necessary to fill the analytical and evidentiary gap in her opinions. *See* Section II.B.4, *supra*. Even if Dr. Apsel had it, more than simple "experience" is required for an expert opinion in a technical field; there must be a reproducible scientific method. *Cooper v. Marten Transport, Ltd.*, 2013 WL 5381152, *2 (11th Cir. Sept. 27, 2013) (affirming preclusion of biomechanical engineer's opinions because they were not the product of "scientifically reliable methodology"; the expert reviewed case materials, thought about it, and then reached a conclusion but the opinion was "connected to the existing data only by the *ipse dixit* of the expert"). Dr. Apsel's qualitative, subjective "belief" is not falsifiable or testable and there is no way that Dr. Apsel's undisclosed method of analysis for these elements could ever be reproduced.

Dr. Apsel's own opinions confirm that her analysis lacks the rigor and evidentiary basis that the law requires. For example, she opined that the "fixedly connected" limitation requires direct coupling—any intermediate circuit, whether or not it is a switching element, would prevent contacts from being "fixedly connected" to the semiconductor device. Ex. 2 at 267:18-268:16, 268:17-22 ("**Q.** Okay. So if the contacts are not coupled that means they are not fixedly connected.· Is that what you are saying? **A.** Yes. <u>The contacts would not be fixedly connected in that case because there is an intermediate circuit of some sort</u>. ") (emphasis added); *see also* Ex. 11 at 71:14-22 (inventor confirming that "fixedly" requires "direct lines" from the contacts to the microprocessor). Yet, she has done no analysis whatsoever to confirm that every accused product lacks intermediate circuits between the contacts and any component that she claims is the

semiconductor device, nor has she reviewed any documents that have sufficient technical detail for her to reach such a conclusion.

Regarding claim 25, Dr. Apsel admitted that if contactless and contact data arrive at the microcontroller at the same time, she does not know how the microcontroller would handle the data internally and "would have to look and see how [the microcontroller] is programmed to answer that question." Ex. 2 at 157:19-158:5. But she does not have that information. *Id.* Indeed, Dr. Apsel has not analyzed <u>any</u> firmware, software, or microcode for purposes of this case. *Id.* at 176:3-6.

Dr. Apsel's opinions repeatedly fail to rely on actual evidence or analysis regarding how even one actual accused product is implemented in real life. *See, e.g.,* Ex. 2 162:19-163:2 ("I certainly can <u>imagine</u> that there is a line here that ISO 7816 which implies that there is some type of interface between the UICC and the host processor using ISO 7816 and I <u>imagine</u> that that implies there is a contact to the processor that allows that interface to occur.") (emphasis added). In essence, Dr. Apsel intends to point to black boxes in a generic "NFC phone" and other black boxes in a generic "SWP SIM card" and tell the jury that the accused products must infringe because, although she has no evidence regarding the specific circuitry inside those boxes or how precisely the manufacturers of any real products actually decided to interconnect them, she "believes" that they satisfy all claim elements.

The law does not permit OTI to present such vacuous expert opinions to the jury. *Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 91–92 (2d Cir. 2000) (expert formed conclusions about boat crash without having "seen the actual boat" and unaware of its dimensions or design). To the contrary, "a court should not consider an expert's mere conclusory statements without analytical basis." *Leveraged Innovations*, 2012 WL 4062100 at *5; *Country Rd. Music*, 279 F. Supp. 2d at 330. Dr. Apsel's unsupported beliefs and imaginative conclusions should be excluded as "speculative and untested," *Lynch v. Trek Bicycle Corp.*, 374 Fed. Appx. 204, 207 (2d Cir. 2010), and because they are "based on conjecture rather than evidence in the record." *Allstate Insurance Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 458 (2d Cir.

2007).“[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony.” *Amorgianos*, 303 F.3d at 266; *accord In re Omeprazole Patent Litigation*, 490 F.Supp.2d 381, 401 (S.D.N.Y. 2007); *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005); *Nimely v. City of New York*, 414 F.3d 381, 396 97 (2d Cir. 2005).

**2. Dr. Apsel ignored relevant evidence in favor of baseless and unreliable assumptions.**

Dr. Apsel also made unsupported assumptions, or just downright ignored, the limited technical information that she did have regarding the switching elements in the accused products. Despite Dr. Apsel’s conclusion that the products have no switching element, she admitted that she had not analyzed the components along the data paths for contact and contactless data. For example, Dr. Apsel opined that the STMicroelectronics microcontroller contains an internal bus on the data path between any contacts and its microprocessor (CPU). This is depicted in the figure below with Dr. Apsel’s own hand drawn annotations provided during her deposition:

Ex. 8 at TMUS-OTI0047754. But Dr. Apsel also admitted that she had not analyzed the internal bus to determine whether it was a switching element.

Dr. Apsel confirmed that the small, circled box in the figure is a Central Processing Unit (CPU). Ex. 2 at 30:19-23, 147:6-149:11. She also opined that a CPU is a microprocessor and that a microprocessor is one form of semiconductor device. *Id.*; Ex. 9 at 31:25-32:4, 32:15-18. She further opined that the SWP SIM card's microprocessor is the semiconductor device under the claims (although she paradoxically also referred to the entire SIM card as the semiconductor device). Ex. 2 at 30:19-23, 147:6-149:11; 224:16-20. Yet, Dr. Apsel did not even bother to analyze the "Internal Bus (APB/AHB)" on the data path between the microprocessor and the product's contacts, and was unable (or unwilling) to say, one way or another, whether that bus is a switching element. Ex. 2 at 189:10-190:25. Her failure to even attempt to examine this relevant information is particularly intolerable given her admission that a conventional bus can be considered a type of switching element and that microcontrollers contain switches. Ex. 2 at 265:14-21, 264:12-23; Ex. 9 at 33:4-13.[8]

Further, Dr. Apsel's reliance on OTI's lawyer and its Chief Technology Officer (Hemy Itay) to form and write aspects of her opinions renders her "in essence, a highly qualified puppet" and renders her opinions unreliable. Ex. 2 at 35:6-36:22, 19:21-24:4; *DataQuill Ltd. v. Handspring, Inc.*, No. 01 C 4635, 2003 WL 737785, *4 (N.D. Ill. Feb. 28, 2003) (striking expert report where infringement expert "fail[ed] to state the basis and reasons" for his opinions, failed to explain "why features satisfied particular claim limitations," "simply assumed that a device feature satisfied a claim term," and relied on party's counsel to write the report); ); *Arista Records*, 608 F. Supp. 2d at 428-29 (striking portions of expert testimony where expert simply accepted information provided by the party retaining him and collecting cases). Hence it is no

[8] Dr. Apsel's failure to analyze, or even consider, this essential information is fatal to her conclusory infringement opinions. An expert opinion based on incomplete and selective facts is unreliable and not admissible. *Arjangrad v. JPMorgan Chase Bank, N.A.*, No. 3:10-cv-01157-PK, 2012 WL 1890372, at *6 (D. Or. May 23, 2012) (rejecting argument "that the completeness of the materials [expert] reviewed is an issue going to the weight of his testimony, not its admissibility"); *Smith v. Pac. Bell Tel. Co.*, 649 F. Supp. 2d 1073, 1096-97 (E.D. Cal. 2009) (refusing to admit testimony of an expert in part because expert's report was based on incomplete facts and selective documents).

surprise that she lacks any basis for the claim elements that she simply assumed were met without any supporting evidence.

**3. Dr. Apsel's opinions may also be stricken as irrelevant because they fail to create a genuine issue for trial.**

Dr. Apsel's conclusory opinions are also irrelevant because they fail to create a genuine issue for trial—"It is well settled that an expert's unsupported conclusion on the ultimate issue of infringement is insufficient to raise a genuine issue of material fact, and that a party may not avoid that rule simply by framing the expert's conclusion as an assertion that a particular critical claim limitation is found in the accused device." *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1278 (Fed. Cir. 2004); *Intellectual Science and Technology, Inc. v. Sony Electronics, Inc.*, 589 F.3d 1179, 1184 (Fed. Cir. 2009) (same); *Arthur A. Collins, Inc. v. Northern Telecom Ltd.*, 216 F.3d 1042, 1046 (Fed. Cir. 2000) ("an unsupported assertion that the accused device contains a critical claim limitation" was insufficient). Courts have ruled time and again that conclusory expert pronouncements, devoid of facts upon which the conclusions were reached, are "inappropriate" and fail to raise any genuine issues for the jury to resolve.[9] This holds true in patent cases, where district courts have routinely excluded expert witnesses when their analysis is "thin" and "conclusory."[10]

[9] *See, e.g., Major League Baseball Props. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d. Cir. 2008) ("An expert's conclusory opinions are similarly inappropriate."); *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1317 (Fed. Cir. 1999); *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997) (affirming summary judgment because patentee's expert's statements were conclusory and thus failed to raise a genuine issue of material fact).

[10] *See, e.g., XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 09-157-RGA, 2013 WL 865974, *2 (D. Del. Mar. 7, 2013). In *Milos Misha Subotincic v. Ontario Inc.*, No. 10-01946 AG, 2013 WL 3964994, *9 (C.D. Cal. Apr. 9, 2013), where the technical expert failed to analyze specific claim terms related to movement, the court limited infringement expert's opinion to exclude mention of "movement" of the accused device and to exclude "his opinion on an ultimate conclusion of infringement." *Id.* at *14. The expert did no actual analysis regarding the movement of the accused device. *Id.* Instead, the report "merely contain[ed] a chart where a picture is inserted next to the limitations having to do with movement." *Id.* at *13.

**4. Dr. Apsel's failure to analyze each accused product renders her opinions unreliable.**

Dr. Apsel's report draws no distinctions between any of the eight separate phones she purports to address, nor does she provide any rationale for her decision to treat them all as identical. Rather than analyzing any technical information for actual accused products, Dr. Apsel references a T-Mobile product requirements document and various industry standards. But none of those materials dictate the specific circuit layout, interconnections, or intervening circuits or programming for any accused products or their components, nor do they set any circuitry requirement that precludes using the switching elements that the '043 patent disclaims. The documents simply do not address devices at that level of detail. Further, Dr. Apsel's report never opines, let alone provides support for any opinion, that all products that meet any industry standard or high-level product requirements document must necessarily infringe. Under these circumstances, references to generalized industry standards or requirements are not sufficiently reliable to support an infringement opinion without analyzing each specific accused product. *Fujitsu Ltd. v. Netgear,* 620 F.3d 1321, 1327-1328 (Fed. Cir. 2010) ("*Fujitsu II*").

As the Federal Circuit explained in *Fujitsu II*, "in many instances, an industry standard does not provide the level of specificity required to establish that practicing that standard would always result in infringement." *Id.* at 1327-28. This is because "[d]ifferent accused devices may achieve compliance with an industry standard or protocol through varying designs, with different tolerances, and with competing features." *WiAV Networks, LLC v. 3Com Corp.*, No. C 10–03448, 2010 WL 3895047 at *2 (N.D. Cal. Oct. 1, 2010) ("only in situations where a properly construed patent covers *all required elements* of an industry standard will it be enough to prove infringement by showing compliance with the standard.") (citing *Fujitsu II*). "Slight variations in product functionality may be the difference between infringement and noninfringement" by particular products that may otherwise comply with a standard. *Fujitsu Ltd. v. Netgear, Inc.*, No. 07-cv-710, 2009 WL 3047616 at *4 (W.D. Wis. Sept. 18, 2009) ("*Fujitsu I*"), *rev'd in part on other grounds, Fujitsu II*. In those instances, "it is not sufficient for the patent owner to establish

infringement by arguing that the product admittedly practices the standard, therefore it infringes;" instead, "the patent owner must compare the claims to the accused products" on a product-by-product basis. *Fujitsu II* at 1328; *WiAV Networks*, 2010 WL 3895047 at *2 ("the *Fujitsu* decision observed that an asserted patent claim—properly construed—might not cover all implementations of an industry standard. In such situations, the Federal Circuit emphasized that infringement would *have* to be proven on a product-by-product basis.") (second emphasis added).

## V. CONCLUSION

OTI seeks to present an infringement case to the jury based on nothing more than an expert's conclusory and unreliable "beliefs" and "imagination" that multiple claim element are met. Those opinions are not based on any technical information at all regarding the accused phones, dubious and incomplete information regarding the components that they may or may not contain, and no evidence or supportable analysis regarding multiple essential claim elements. The entire report is therefore based on the premise that one can find infringement of critical claim elements—including the very elements used to distinguish the patent from the prior art—based solely on an expert's *ipse dixit*. The Court's role as a gatekeeper under *Daubert* and the Federal Rules of Evidence were built for precisely this situation. The Court should exclude Dr. Apsel's conclusory and unreliable infringement opinions.

Dated: March 31, 2014

Respectfully submitted,

IRELL & MANELLA LLP
John C. Hueston
Ellisen S. Turner
Douglas J. Dixon
Benjamin Haber

By: */s/ Ellisen S. Turner*
Ellisen S. Turner
Attorneys for Defendant and Counterclaimant
T-MOBILE USA, INC.

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on March 31, 2014, a true and correct copy of the foregoing was electronically filed via the U.S. District Court CM/ECF and served via email upon the following counsel for Plaintiff:

Guy Yonay (GY-3028)
GYonay@pearlcohen.com
Clyde A. Shuman (CS-6351)
CShuman@pearlcohen.com
Jessica W. Lin (JL-9029)
JLin@pearlcohen.com

By: */s/ Ellisen S. Turner*
Ellisen S. Turner
IRELL & MANELLA LLP
Attorneys for Defendant and Counterclaimant
T-MOBILE USA, INC.