**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ON TRACK INNOVATIONS LTD., an Israeli company ) | Case No. 1:12-cv-02224-AJN-JCF |
| ) | |
| Plaintiff, ) | ECF Case |
| ) | |
| v. ) | |
| ) | |
| T-MOBILE USA, INC., a Delaware corporation ) | |
| ) | |
| Defendant. ) | |

**ON TRACK INNOVATIONS LTD.'S OPPOSITION TO T-MOBILE'S**
<u>**MOTION TO STRIKE DR. MEYER'S DAMAGES REPORT**</u>

**CONTAINS "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL ONLY"**
**INFORMATION SUBJECT TO PROTECTIVE ORDER**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................1

      A.    OTI and the '043 Patent ...............................................................................1

      B.    Mobile Commerce was T-Mobile's
            Largest Adjacent Business Opportunity ........................................................2

      C.    T-Mobile's Need for the '043 Patented Technology ....................................4

            1.    The '043 Patent Provided Substantial Benefits to T-Mobile .......................4

            2.    There Were No Feasible Non-Infringing Alternatives .................................5

III.  DR. MEYER'S DAMAGES REPORT ..................................................................7

      A.    Dr. Meyer Reviewed Extensive Evidence ....................................................7

      B.    Dr. Meyer Correctly Determined the Bargaining
            Range of the Hypothetical Negotiation.........................................................7

            1.    Dr. Meyer Considered T-Mobile's Willingness to Take a License ............7

            2.    Dr. Meyer Considered OTI's Willingness to Grant a License....................8

      C.    Dr. Meyer Applied the *Georgia-Pacific* Factors to the Bargaining
            Range to Determine the Outcome of the Hypothetical Negotiation ..................9

IV.   LEGAL STANDARD.............................................................................................10

V.    ARGUMENT .........................................................................................................13

      A.    Dr. Meyer's Opinions Satisfy Fed. R. Evid. 702 .......................................13

      B.    There is Ample Basis for Dr. Meyer's License Structure......................14

i

C.    The Running Royalty Component of Dr. Meyer's
      Opinion is Based on Sound Methodology ............................................15

      1.    Because There is no "Established" Royalty for the '043 Patent,
            Dr. Meyer Correctly Applied a Hypothetical Negotiation Construct ........16

      2.    Dr. Meyer Properly Considered the Via
            Licensing NFC Patent Licensing Program .................................16

            a.    The Via Licensing NFC Patent License
                  Program is Technically Relevant ...................................17

            b.    Dr. Meyer Properly Adjusted the Via Licensing
                  NFC Patent License Rates for Economic Comparability .............20

      3.    Dr. Meyer Correctly Gave Little Weight to Prior OTI Licenses ..............22

D.    There is Sufficient Basis for the Initial Lump
      Sum Component of Dr. Meyer's Opinion............................................23

E.    T-Mobile's Entire Market Value Rule Argument is Misplaced ............................24

VI.   CONCLUSION...........................................................................25

# TABLE OF AUTHORITIES

**Case**                                                                                             **Page**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256, 267 (2d Cir. 2002)..................................................................11

*Apple, Inc. v. Motorola, Inc.*,
Case No. 2012-1548 p. 40 (Fed. Cir. April 25, 2014) ...........................11, 12, 15

*AVM Techs, LLC v. Intel Corp.*,
2013 WL 126233 (D. Del. Jan. 4, 2013)..................................................22 n.7

*Campbell v. Met. Prop. & Cas. Ins. Co.*,
239 F.3d 179, 186 (2d Cir. 2001)..................................................................11

*Concord Camera Corp. v. Fuji Photo Film Co.*,
2000 WL 1013958 (S.D.N.Y. July 24, 2000) ..................................................24

*Cornell University v. Hewlett-Packard Co.*,
609 F.Supp.2d 279 (N.D.N.Y. 2009, Rader J.)...............................................25

*Country Road Music, Inc. v. MP3.com, Inc.*,
279 F.Supp.2d 325, 330-331 (S.D.N.Y. 2003) ..........................................22 n.7

*Dataquill Ltd. v. High Tech Computer Corp.*,
2012 WL 1284381 *5 (S.D. Cal. Apr. 16, 2012)............................18, 19, 21 n.7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579, 597 (1995)..............................................................................11

*Deputy v. Lehmand Bros.*,
345 F.3d 494, 507 (7th Cir. 2003) ................................................................14

*Figueroa v. Boston Sci. Corp.*,
254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003)...................................................12

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197, 1211-1212 (Fed. Cir. 2010) .................................................22

*Fromson v. Western Litho Plate & Supply Co.*,
853 F.2d 1568, 1574 (Fed. Cir. 1988).......................................................9 n.3

*Fujifilm Corp. v. Benun*,
605 F.3d 1366 (Fed. Cir. 2010).....................................................................14

*Gen-Probe Inc. v. Becton Dickinson & Co.*,
2012 WL 9335913 (S.D. Cal. Nov. 26, 2012) ..........................................12, 19

*Georgia-Pacific Corp. v. U.S. Plywood Corp.,*
  318 F. Supp. 1116 (S.D.N.Y. 1970)........................................................................ *passim*

*Halo Electronics, Inc. v. Pulse Electronics, Inc.,*
  900 F.Supp.2d 1160 (D. Nev. 2012)................................................................12

*Hanson v. Alpine Valley Ski Area, Inc.,*
  718 F.2d 1075, 1078 (Fed. Cir. 1983).......................................................16, 17

*i4i Ltd. Partnership v. Microsoft Corp.,*
  598 F.3d 831, 855-856 (Fed. Cir. 2010) ..................................................11, 16

*In re Innovatio IP Ventures LLC Patent Litigation,*
  Case 1:11-CV-09308, Doc. No. 975, (N.D. Ill. Oct. 3, 2013) ........................21

*Integra Lifesciences I, Ltd. v. Merck KGaA,*
  331 F.3d 860, 871 (Fed. Cir. 2003)..................................................................18

*LaserDynamics, Inc. v. Quanta Computer, Inc.,*
  694 F.3d 51, 77-78 (Fed. Cir. 2012) ....................................................19, 22, 24

*Lucent Techs., Inc. v. Gateway, Inc.,*
  580 F.3d 1301, 1326 (Fed. Cir. 2009)............................................................15, 18

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,*
  2012 WL 2568972 (S.D.N.Y., July 3, 2012) ..................................................11

*Micro Chemical, Inc. v. Lextron, Inc.,*
  317 F.3d 1387, 1394 (Fed. Cir. 2003)..............................................................12

*Microsoft Corp. v. Motorola, Inc.,*
  Case No. C10-1823JLR (W.D. Wash. April 25, 2013) ....................................21

*Oracle America, Inc. v. Google Inc.,*
  798 F.Supp.2d 1111, 1121 (N.D. Cal. 2011) ..................................................17

*ResQNet.com, Inc. v. Lansa, Inc.,*
  594 F.3d 860, 870 (Fed. Cir. 2010)..................................................................19

*Rite-Hite Corp. v. Kelley Co., Inc.,*
  56 F.3d 1538, 1554 (Fed. Cir. 1995).................................................................16

*Rude v. Westcott,*
  130 U.S. 152 (1889)............................................................................................16

*Synthes USA, LLC v. Spinal Kinetics, Inc.,*
  2011 WL 11709387 *8 (N.D. Cal. Aug. 19, 2011) ..........................................18

*Third Wave Techs., Inc. v. Strategene Corp.*,
    405 F.Supp.2d 991, 1012 (W.D. Wis. 2005) ....................................................................15

*Trell v. Marlee Electronics Corp.*,
    912 F.2d 1443 (Fed. Cir. 1990)......................................................................................17

*Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*,
    609 F.3d 1308 (Fed. Cir. 2010).....................................................................................22

**Statute**                                                                    **Page**

35 U.S.C. § 284...........................................................................................................9 n.3

**Rule**                                                                      **Page**

Fed. R. Evid. 702 ............................................................................................................10

**Treatise**                                                         **Page**

*Weinstein* at §13.02 [2] at 5-6 (2014) ...........................................................................12

# I.      INTRODUCTION

T-Mobile's motion to exclude Dr. Meyer's testimony (like its motion to exclude Dr. Apsel) is a meritless attempt to use a procedural tool to avoid the financial consequence of its infringement.  As explained in OTI's motion for summary judgment on infringement, the undisputed facts prove that T-Mobile infringes.  Rather than defend the case on the merits, T-Mobile demands that the Court preclude OTI from proving its case, effectively a disguised motion for summary judgment.  *Daubert*, however, is not a "Get Out of Jail Free" card.  It is meant to prevent untethered expert testimony from influencing a jury, which is not the case here.

To calculate reasonable royalty damages, both Dr. Meyer and T-Mobile's damages expert Mr. Napper used the standard methodology: both applied a hypothetical negotiation construct, both considered *Georgia-Pacific* factors, including a consideration of industry license rates, and both applied the rates to the same infringing units – the entire mobile phone.  Unsurprisingly, Dr. Meyer and Mr. Napper reached different conclusions: Dr. Meyer opined that OTI and T-Mobile would have agreed to a running royalty of 49 cents and decreasing to 4.9 cents for large volumes, plus a modest, and conventional, initial payment of $4 million; Mr. Napper's running royalty rate was 4 cents per infringing phone – a fraction of what OTI charged licensees 10-15 years ago.

That T-Mobile disagrees with Dr. Meyer's conclusions is no basis to exclude her testimony: it is relevant, thoroughly supported by an extensive factual record, and uses reliable and well-accepted methodology.  The proper way to challenge Dr. Meyer's opinions is to cross-examine her at trial – not to silence her.

# II.     STATEMENT OF FACTS

## A.      OTI and the '043 Patent

The '043 Patent describes an electrical arrangement including contacts, an antenna coil, an antenna interface, and a semiconductor device (i.e., a microprocessor).  The invention allows

1

communication with the microprocessor using two independent channels, for contact and contactless data communication.

**B.      Mobile Commerce was T-Mobile's
            Largest Adjacent Business Opportunity**

Lin Ex. 8, TMUS-OTI0040645-40652 at

40646; Lin Ex. 9, TMUS-OTI0049942-49975 at 49942; Lin Ex. 10, Bell Tr. 115-116).



███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████

**C.     T-Mobile's Need for the '043 Patented Technology**

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

T-Mobile's choice of an infringing configuration was no mere chance; it gave T-Mobile

significant benefits, and the other alternatives were not (and still are not) truly feasible.[1]

**1.     The '043 Patent Provided Substantial Benefits to T-Mobile**

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███ ███████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████  In contrast, using a switching mechanism (as in the prior art) would possibly terminate phone calls during an NFC transaction.  (Apsel Dec., Ex. B, Apsel Inf. Rpt. ¶83(a)).  ███████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

    The patented technology also allowed T-Mobile's NFC phones to continue to operate using existing protocols without the cost, uncertainty, or delay of extensive redesign.  For example, using the technology simplified determining whether a command to the secure element originated from the phone's host processor or vendor's contactless reader.  (Apsel Dec., Ex. B, Apsel Inf. Rpt. ¶83(b)).  Also, by using the patented technology, the phone's host processor can continue to communicate with the secure element using pre-existing standards without modification.  (Apsel Dec., Ex. B, Apsel Inf. Rpt. ¶83(c)).

    **2.**    **There Were No Feasible Non-Infringing Alternatives**

██████████████████████████████████████████████████████

███████████████████  █████████████████████  ██████████████████████

███████████████████████████████████

██████████████████████████████

████████████████████████████████████

█████████████████████████████████████

████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

████████████████████████████████

█████████████████████████████████████

███████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████

██████████████████████████████████

█████████

Finally, any attempt by T-Mobile to create a new (i.e., commercially unavailable) non-infringing design would have been uncertain, and would have caused T-Mobile to incur out-of-pocket costs and further delayed launch, possibly allowing competitors to gain a foothold in the mobile payment market, likely reducing T-Mobile's market share.

---

[2] ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████

## III.   DR. MEYER'S DAMAGES REPORT

Dr. Meyer has a Ph.D. in economics from MIT and 13 years of experience in intellectual property economics, industrial organization, calculating commercial damages, and valuation. (Lin Ex. 23, Meyer Rpt. Exh. 1).  T-Mobile does not (and cannot) challenge her qualifications as an expert.

### A.   Dr. Meyer Reviewed Extensive Evidence

In arriving at her opinions, Dr. Meyer reviewed thousands of pages of T-Mobile and ISIS planning, strategy, and financial documents related to mobile payments (including forecasts and valuations for its mobile payments), deposition transcripts of T-Mobile personnel who selected the infringing product and evaluated its role in the mobile payment system, as well as extensive publicly available materials related to NFC and mobile payments. (Lin Ex. 23, Meyer Rpt. Exh. 2).  Dr. Meyer based her understanding of the '043 Patent, the infringing technology, and the absence of suitable non-infringing alternatives on OTI's technical expert, Dr. Apsel.  (Dixon Ex. 2, Meyer Rpt. n. 30).  There is no question that Dr. Meyer carefully analyzed all relevant evidence, and there is no question that her opinion is based on that information.

### B.   Dr. Meyer Correctly Determined the Bargaining Range of the Hypothetical Negotiation

Dr. Meyer used the standard methodology to determine a reasonable royalty, namely a consideration of the *Georgia-Pacific* factors (as did Mr. Napper).  As required, Dr. Meyer first determined the date and framework of the hypothetical negotiation.  (Meyer Rpt. ¶¶21-32).  She then analyzed the costs and benefits to OTI and T-Mobile of licensing the '043 patent to arrive at a bargaining range for the hypothetical negotiation, establishing the outer boundaries of the reasonable royalty framework.  (Meyer Rpt. ¶¶33-51).

#### 1.   Dr. Meyer Considered T-Mobile's Willingness to Take a License

To assess T-Mobile's willingness to pay for a license, Dr. Meyer carefully considered T-

Mobile documents contemporaneous with the hypothetical negotiation (and related deposition testimony of T-Mobile personnel).



Based on Dr. Apsel's opinion and T-Mobile's investigation, Dr. Meyer understood that there was no way to timely and cost-effectively achieve all the benefits associated with NFC without infringing the '043 Patent (Meyer Rpt. ¶47 n.30).  Accordingly, failure to take a license to the '043 Patent would put at risk T-Mobile's investment in ISIS and its entire expected profits from its participation in ISIS – hundreds of millions of dollars, not including lost equity value in ISIS and potential adverse effects on the competitiveness on T-Mobile's core business.  (Meyer Rpt. ¶49).  This marks the high end of the range of a royalty in the hypothetical negotiation.

### 2.    Dr. Meyer Considered OTI's Willingness to Grant a License

Dr. Meyer next analyzed OTI's economic interest at the hypothetical negotiation. Despite the fact that OTI sold devices that enable NFC capabilities on certain mobile phones, Dr. Meyer reasonably determined that, given T-Mobile's rejection of similar devices, T-Mobile's infringement of the '043 Patent was unlikely to have caused OTI to lose sales.  (Meyer Rpt. ¶51).

Consequently, Dr. Meyer determined that "OTI would have been better off by receiving any positive royalty and would therefore, be willing to accept any positive royalty for a license."[3]

### C.   Dr. Meyer Applied the *Georgia-Pacific* Factors to the Bargaining Range to Determine the Outcome of the Hypothetical Negotiation

After establishing the bargaining range for the hypothetical negotiation, Dr. Meyer analyzed all of the *Georgia-Pacific* factors.  (Meyer Rpt. ¶¶53-76).  She acknowledged the contributions of T-Mobile's efforts to the development, marketing, and operation of its ISIS mobile wallet product to apportion expected profits to the infringing technology and to leave T-Mobile with expected profit to compensate if for its efforts to develop and market a mobile wallet product.  (Meyer Rpt. ¶69).  Key factors to Dr. Meyer's analysis included, for example:



---

<div style="font-size:smaller">

3    T-Mobile argues (Doc. No. 143, p. 17 n.5) that this means OTI could not have obtained an initial payment from T-Mobile, because anything was good enough, but this ignores 35 U.S.C. §284.  *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988) (low reasonable royalty damages creates "the perception that blatant, blind appropriation of inventions patented by individual, nonmanufacturing inventors is the profitable, can't-lose course.")

</div>



preference to pay a royalty as a single lump sum amount, but noted that T-Mobile did not produce contemporaneous forecasts of its activations of SWP SIM cards that would allow calculation of a pure lump sum royalty based on expected future infringement.  (Meyer Rpt. ¶78).

(Meyer Rpt. ¶¶77-80).[4]

All the evidence Dr. Meyer reviewed also led her to conclude that OTI could have charged (and T-Mobile would have been willing to pay) a premium over the running rate in the form of an initial lump sum, consistent with other licenses in the industry.

## IV.   LEGAL STANDARD

Federal Rule of Evidence 702 sets the standard for admissibility of expert opinions, which T-Mobile mentions only in passing (Doc. No. 143 at 7-8):

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;

---

[4]     When applied to SWP SIM card activations through October 2013, this equals $611,862.  (Meyer Rpt. ¶7)

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1995), the

Supreme Court reaffirmed that the Court's gatekeeping function does not supplant the traditional

preference for deciding disputes on the merits and using cross-examination to arrive at the truth:

> In this regard respondent seems to us to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

See also *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (*Daubert*

"accords with the liberal admissibility standards of the federal rules and recognizes that our

adversary system provides the necessary tools for challenging reliable, albeit debatable, expert

testimony."); *MBIA Ins. Corp. v. Patriarch Partners VIII, LLC*, 2012 WL 2568972 (S.D.N.Y.,

July 3, 2012) (Second Circuit standard for admissibility is "especially broad.").

Under *Daubert*, "[w]hen the methodology is sound, and the evidence relied upon

sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above

this minimum threshold) may go to the testimony's weight, but not its admissibility." *i4i Ltd.*

*Partnership v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010).

> Questions about what facts are most relevant or reliable to calculating a reasonable royalty are for the jury. The jury was entitled to hear the expert testimony and decide for itself what to accept or reject.

*i4i*, *supra* at 855-856.

> A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are solely reserved for the fact finder.

*Apple, Inc. v. Motorola, Inc.*, Case No. 2012-1548 p. 40 (Fed. Cir. April 25, 2014).  See also,

*Campbell v. Met. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001) (gaps or

11

inconsistencies in the reasoning leading to expert opinion "go to the weight of the evidence, not

to its admissibility").  As Judge Weinstein explained:

> Because the Federal Rules relax the common-law restrictions on the
> admissibility of expert testimony, *doubts about the usefulness of proffered
> testimony should generally be resolved in favor of admissibility*. The jury,
> aided by counsel and the court's instructions, is generally intelligent enough to
> ignore what is unhelpful in its deliberations.

*Weinstein* at §13.02 [2] at 5-6 (2014) (footnotes omitted; emphasis added); *Figueroa v. Boston*

*Sci. Corp.*, 254 F. Supp. 2d 361, 366 (S.D.N.Y. 2003) ("Rejection of expert testimony, therefore,

is still the exception rather than the rule.")

Routine disagreement with an expert's opinion, as here, is no ground to exclude that

expert's opinion:

> This case is a classic example of competing experts. Each side had the
> opportunity to present its damages theory. Each party's expert supported
> his reasonable royalty determination with an analysis of relevant factors
> based on his client's view of the disputed facts. The outcome of the case
> depended to a large extent upon which predicate facts the jury believed,
> and then on which expert's analysis they believed.

*Micro Chemical, Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir. 2003).

Moreover, the Federal Circuit has "recognized that estimating a 'reasonable royalty' is

not an exact science. As such, the record may support a range of "reasonable" royalties, rather

than a single value. Likewise, there may be more than one reliable method for estimating a

reasonable royalty."  *Apple, Inc. v. Motorola, Inc.*, *supra* at 41.  *Gen-Probe Inc. v. Becton*

*Dickinson & Co.*, 2012 WL 9335913 *2 (S.D. Cal. Nov. 26, 2012) (reasonable royalty

calculation, "necessarily involves an element of approximation and uncertainty"); *Halo*

*Electronics, Inc. v. Pulse Electronics, Inc.*, 900 F.Supp.2d 1160 (D. Nev. 2012) (denying motion

to strike, noting that estimation was necessary given the lack of specific data).  That T-Mobile's

expert, Mr. Napper, reached a different conclusion are no reason exclude the testimony.

## V.     ARGUMENT

### A.     Dr. Meyer's Opinions Satisfy Fed. R. Evid. 702

The only element of Rule 702 that T-Mobile seems to argue is missing from Dr. Meyer's opinion is Rule 702(b) "testimony is based on sufficient facts or data" (Doc. No. 143 at 8), which T-Mobile then converts into its primary argument, that Dr. Meyer's opinion supposedly is "unreliable" (Doc. No. 143 at title, headings III.A, III.B, IV.A and IV.B).  However, Dr. Meyer considered all the relevant documents and testimony; her testimony is based on sufficient facts and data.

T-Mobile cannot seriously dispute that an economist's opinion on a reasonable royalty is relevant to a patent infringement case.  Nevertheless, T-Mobile tries to bootstrap an argument about Rule 702(a), asserting that Dr. Meyer's testimony is not helpful or would not assist the jury.  (Doc. No. 143 at 9-10).  There is nothing irrelevant, "confus[ing]" or "mislead[ing]" about her testimony (Doc. No. 143 at 10), and T-Mobile never articulates a basis for these conclusory assertions.  It simply does not like the numbers she reached, but that is no grounds for exclusion.

Regarding Rule 702(c) – the principles and methods used – there simply can be no sound reason to exclude Dr. Meyer's testimony: she followed essentially the same underlying methodology as T-Mobile's expert, but simply reached a different conclusion.  *i4i, supra*.  Based on the underlying facts (T-Mobile's need for the patented technology, its expectations for a sizable economic return, and industry licenses), Dr. Meyer came to an opinion about the economic reality that T-Mobile faced.  Following a careful analysis of all the relevant factors, excluding or giving little weight to certain factors and more to others, she then reached her conclusions.  There is nothing "arbitrary and unrelated to the facts" (Doc. No. 143 at 10) about it.

Finally, Dr. Meyer reliably applied the *Georgia Pacific* factors (Rule 702(d)).  She gave some facts more weight than others – as any good expert is expected to do – explaining, for

example, why OTI's Samsung and CIDC licenses were not appropriate comparisons in this case. T-Mobile may disagree with the *conclusions* based on her analysis, but the underlying methodology and principles are sound.

When the day is done, the framework of Dr. Meyer's analysis is not much different from Mr. Napper's.  T-Mobile's complaint, therefore, is improperly directed to her conclusions, not her methodology.  *Deputy v. Lehmand Bros.,* 345 F.3d 494, 507 (7th Cir. 2003) (focus of a *Daubert* inquiry "must be solely on principles and methodology, not on the conclusions they generate.").

###   B.   There is Ample Basis for Dr. Meyer's License Structure

Although T-Mobile asks the Court to exclude Dr. Meyer's testimony on the lump-sum payment, those structures are common, e.g., *Fujifilm Corp. v. Benun*, 605 F.3d 1366 (Fed. Cir. 2010) (affirming damages award including 40 cent royalty rate and $2.5 million lump sum), and it one OTI has agreed to the past.

This structure allocates risk between OTI and T-Mobile.  It guarantees that OTI obtains some upfront compensation for T-Mobile's decision to use OTI's patented technology, as well as future compensation depending on the extent of T-Mobile's ongoing infringement.  The structure also allows T-Mobile to avoid the ongoing payments, for example, if NFC fails commercially, or if T-Mobile stops distributing the infringing technology.  Indeed, under this payment structure, T-Mobile need not pay a nickel in the future if T-Mobile switches to any of the supposedly non-infringing alternatives – a decision that lies solely in T-Mobile's control.

As the Federal Circuit held, this sort of risk allocation is well established:

> A running royalty structure shifts many licensing risks to the licensor because he does not receive a guaranteed payment.  Royalties are dependent on the level of sales or usage by the licensee, which the licensee can often control.

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009).  T-Mobile's expert

witness Mr. Napper admitted that parties may structure a license to include both components

(Lin Ex. 21, Napper Tr. 232:1-10).

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████  In another case, Mr.

Napper admitted that combined up-front and running royalty licenses are "fairly common

because companies in the biosciences and life sciences are willing to pay upfront royalties for

access to the kinds of technology that will enable them to achieve early entry into markets."

*Third Wave Techs., Inc. v. Strategene Corp.*, 405 F.Supp.2d 991, 1012 (W.D. Wis. 2005).  The

same logic applies here: T-Mobile wanted rapid entry into the NFC market, and using the SWP

SIM card – i.e., infringing the '043 Patent – allowed it to do so.  Dr. Meyer used sound

methodology to conclude that OTI and T-Mobile would have agreed to pay an initial lump sum.

### C.  The Running Royalty Component of Dr. Meyer's Opinion is Based on Sound Methodology

T-Mobile's sole reason for seeking to strike Dr. Meyer's running royalty rate is that she

considered the Via Licensing NFC patent licensing program rather than the existing OTI licenses

(Doc. No. 143 at 10-15).  As a matter of law, Dr. Meyer's decision to give more weight to the

Via Licensing NFC rates than OTI's prior licenses cannot be grounds to exclude her well-

reasoned testimony.  *Apple, Inc. v. Motorola, Inc.*, *supra* at 60 ("As we have held many times,

using sufficiently comparable licenses is a generally reliable method of estimating the value of a

patent… whether these licenses are sufficiently comparable… goes to the weight of the evidence,

not its admissibility"); *i4i*, *supra* at 855-856 ("i4i's expert could have used other data in his calculations. The existence of other facts, however, does not mean that the facts used failed to meet the minimum standards of relevance or reliability").   T-Mobile's arguments go to the weight, not admissibility of Dr. Meyer's opinions.

### 1.   Because There is no "Established" Royalty for the '043 Patent, Dr. Meyer Correctly Applied a Hypothetical Negotiation Construct

T-Mobile's criticism of Dr. Meyer confuses an "established" royalty with the result of a hypothetical negotiation. *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983), cited by T-Mobile, holds that "[w]hen an established royalty for the patented inventions is shown to exist, the rate will usually be adopted as the best measure of reasonable and entire compensation."  But in order for a royalty to be "established" it must be paid "by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention." *Hanson*, 718 F.2d at 1078 (quoting *Rude v. Westcott*, 130 U.S. 152 (1889)) (affirming magistrate's finding that a single license agreement did not suffice to show an established royalty).  When there is no established royalty for use of the patent, then the appropriate methodology is a "willing-buyer/willing-seller concept," i.e., a hypothetical license negotiation between the patentee and the prospective infringer. *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995) (*en banc*, citing *Hanson*, *supra* at 1079).

As discussed below, the OTI licenses did not create an "established" royalty for the '043 Patent.  Therefore, Dr. Meyer's use of the hypothetical negotiation construct was correct.

### 2.   Dr. Meyer Properly Considered the Via Licensing NFC Patent Licensing Program

Contrary to T-Mobile's argument (Doc. No. 143 at 15), Dr. Meyer did not consider the Via Licensing NFC patent licensing fees as an "established" royalty (Meyer Rpt. ¶55).  See, e.g., *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) ("the

royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an *established* royalty.")  Rather, in the *absence* of an established royalty, Dr. Meyer considered the Via Licensing NFC patent licensing fees as one of the factors that the parties might have considered in a hypothetical negotiation, e.g., in connection with *Georgia-Pacific* factors 12 and 13 (Meyer Rpt. ¶¶69-74).  The only two cases T-Mobile cites on this point refer to use of licenses for an *established* royalty.  *Hanson*, *supra* (discussed above); *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443 (Fed. Cir. 1990) (reversing district court for relying on a license as proof of an established royalty rate; court should have applied a hypothetical negotiation construct).

T-Mobile does not dispute that the Via Licensing NFC patent license program was an offer by patentees to license their NFC technology.  T-Mobile's argument is that Dr. Meyer had no evidence that anyone *accepted* the Via Licensing offer.  (Doc. No. 143 at 14-15).  But Dr. Meyer specifically noted that she used these rates as an indicator of "the terms under which *other holders of NFC-related patents have been willing to license those patents*."  (Meyer Rpt. ¶69, emphasis added).  This alone cannot preclude it as a matter of law from being considered as a factor in the hypothetical negotiation.  See, e.g., *Oracle America, Inc. v. Google Inc.*, 798 F.Supp.2d 1111, 1121 (N.D. Cal. 2011), cited by T-Mobile (Doc. No. 143 at 24), where the court used an unaccepted offer as the starting point for a reasonable royalty, and proposed adjusting it "upward or downward" based on the circumstances.  As discussed below, Dr. Meyer properly used the Via Licensing NFC patent licensing fees by adjusting them based on the circumstances.

### a. The Via Licensing NFC Patent License Program is Technically Relevant

T-Mobile criticizes Dr. Meyer for not conducting a technical comparison between the patents underlying the Via Licensing NFC patent portfolio and the '043 Patent (Doc. No. 143 at

17

11-13).  But the sort of detailed technical analysis envisioned by T-Mobile would not have been performed in the context of a negotiation, nor is it required here.  Dr. Meyer used the Via Licensing rates as an indicator of the portion of the profits for NFC-related products that has been allocated to patented inventions like the '043 Patent.  She recognized that:

- from the program's inception, the Via Licensing NFC patents were "deemed essential to Near Field Communications (NFC) as practiced by devices that are compliant with ISO 18092… and ISO 21481 (equal to ECMA-352 referencing ISO 14443 A and B as used in NFC applications);"

- in 2008 "there was a call to add other patents to the pool, including essential patents related to ETSI TS 102 613 V7.0.0 (2008-02);" and

- Via Licensing expected "additional patents will be added with no increase in the pool license fee."

(Meyer Rpt. ¶70).  This technology is relevant, since these same communication standards are the ones it mandates for its NFC phones and related to the '043 Patent.  *Synthes USA, LLC v. Spinal Kinetics, Inc.*, 2011 WL 11709387 *8 (N.D. Cal. Aug. 19, 2011) (allowing expert testimony on prior agreements whose technology was "at least marginally relevant" despite differences, noting that "a perfectly comparable agreement is rarely available.")

Federal Circuit case law allows experts to consider licenses for other patents on similar technology, so long as the circumstances of the licenses are comparable.  *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2003) (an appropriate analogue to the hypothetical negotiation was a license between two different parties on "similar technology").  Nothing – including *Lucent*, on which T-Mobile relies (Doc. No. 143 at 11) – requires a more detailed technical analysis.  *Lucent Techs., supra* at 1328 (Fed. Cir. 2009) (no evidentiary record of comparability; Lucent's brief (not expert) characterizing the licenses as "PC-related patents" was insufficient).  *Dataquill Ltd. v. High Tech Computer Corp.*, 2012 WL 1284381 (S.D. Cal. Apr. 16, 2012)*, cited by T-Mobile (Doc. No. 143 at 13), demonstrates that Dr. Meyer's analysis

18

was appropriate.  In that case, the court found sufficient factual basis for finding a prior license "technologically comparable" because it "cover[ed] mobile handsets that could compete with" the accused devices.  *Dataquill, supra* at *5.  Here, Dr. Meyer also recognized that Via Licensing offered licenses to the same sort of NFC phones (e.g., adhering to the ISO 18092 and ISO 14443 standards).  (Meyer Rpt. ¶¶70-71).[5]

In other cases T-Mobile cited, damages awards were vacated based on comparison to licenses whose *circumstances* (not technology) did not reflect the hypothetical negotiation.  *See, e.g., ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) (expert's use of re-branding or re-bundling licenses to show an "established" royalty inapposite); *Integra, supra* at 870-871 (prior license reflected a different risk profile than the parties would have had during the hypothetical negotiation); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77-78 (Fed. Cir. 2012) (rejecting reliance on a settlement on the eve of trial after defendant had been sanctioned, where there were more relevant licenses in the record).

Since the Via Licensing NFC patents apply to the accused devices and to the same industry standards that T-Mobile required of NFC phones and that relate to the '043 Patent, Dr. Meyer correctly considered the rates under *Georgia-Pacific* factors 12 and 13.  *Gen-Probe, supra* at *3 (denying motion to strike, noting "Gen-Probe may highlight the technological and economic distinctions at trial.")

---

[5]     Mr. Napper considered an Innovatron license for patents allegedly essential to one of these same standards (ISO 14443), and he conducted no more technical analysis than Dr. Meyer.  (Lin Ex. 3, Napper Rpt. p. 56). Mr. Napper relied on discussions with Dr. Conrad (Lin Ex. 3, Napper Rpt. p. 57 nn. 233-234), implausibly concluding that "there could be no contactless communication" without the Innovatron patents.  Dr. Conrad had no opinion as to whether these patents are in fact essential, but took Innovatron's statement at face value (Lin Ex. 22, Conrad Rebuttal Rpt. p. 69: "*According to Innovatron*, its patents are essential").  Dr. Conrad's analysis merely concluded that the patents "relate" to devices using ISO 14443.  (Lin Ex. 22, Conrad Rebuttal Rpt. p. 69, ¶¶229-231).

### b.   Dr. Meyer Properly Adjusted the Via Licensing NFC Patent License Rates for Economic Comparability

Dr. Meyer did not, as T-Mobile claims (Doc. No. 143 at 13-14), simply adopt the Via Licensing NFC patent pool rate.  She enumerated reasons why, as an economic matter, the royalty for a license to T-Mobile for the '043 patent would exceed the Via Licensing rates for consumer devices, including:

- T-Mobile's strong commercial preference for using the SWP SIM card as the secure element over other technology (e.g., embedded or MicroSD);

- that the Via Licensing rates were by necessarily non-discriminatory, and therefore were structured for all uses, including products with low profit margins, where the addition of NFC capabilities could not add to the price;

- the deployment of NFC-related technology had increased many times over between the introduction of the Via Licensing NFC-patent license fees in 2007 and the hypothetical negotiation in 2012. (Meyer Rpt. ¶72).

Additionally, Dr. Meyer noted that T-Mobile's NFC phones – unlike the "consumer devices" in the Via Licensing scheme – are "intended primarily for direct *revenue-generating* use."  (Meyer Rpt. p. 31 n. 114.)  For this reason, Dr. Meyer concluded that T-Mobile's use of the patented technology strongly resembled commercial devices, whose rates were many times higher than for consumer devices.  (Meyer Rpt. p. 31 n. 114.)  Dr. Meyer also found that (a) the addition of patents to the Via Licensing pool was not expected to increase the rates, indicating that the license fees need not be incremental to the number of patents licensed, and (b) ISIS was willing to pay running rates for technology licenses as high as $1.25 per wallet *per year* (or $7.50 per wallet over the span of six years) to support NFC. (Meyer Report, ¶¶71, 74.).

Further, Dr. Meyer noted that at least one court has recognized that patent pool rates – such as the Via Licensing rates – tend to be *lower* than rates for bilaterally-negotiated licenses.[6]

---

[6]   Mr. Napper's heavy reliance on the Innovatron patents licenses overlooks the critical fact that Innovatron was involved in the standardization of the technology, and was obligated to grant licenses under fair,

(Meyer Rpt. p. 31 n. 113).  To support this finding, the court in *Microsoft Corp. v. Motorola, Inc.*, Case No. C10-1823JLR (W.D. Wash. April 25, 2013), reasoned that:

- "the principal objective of most pools is not to maximize licensing revenue, but to minimize royalty exposure and maximize freedom of operation for licensees, which drives down the royalty rate;"

- "patent pools that allocate revenue based on patent-counting ignore the value of individual patents being licensed;"

- "due to the non-negotiable nature of patent pool licenses, royalty rates must be low to entice licensees to join;"

- "pools have low licensing transaction costs that allow for lower rates;" and

- "concerns over antitrust scrutiny lead to lower rates."

*Microsoft v. Motorola*, *Id.*, Slip Op. at 160.  The court found that the rate offered by the patent pool was "the low end of the range for a [reasonable and non-discriminatory] royalty" (Slip Op. at 167) and that the actual royalty (in that case) was three times the pool's offered rate.  (Slip Op. at 171).

Dr. Meyer also noted that the Via Licensing fees do not reflect the certainty of validity and infringement of the patents included in the pool, which is a fundamental assumption of the hypothetical negotiation.  See *In re Innovatio IP Ventures LLC Patent Litigation*, Case 1:11-CV-09308, Doc. No. 975, p. 13 (N.D. Ill. Oct. 3, 2013) (noting that *Microsoft v. Motorola* was a contract licensing case, whereas in a patent infringement hypothetical negotiation, the parties "could no longer leave the negotiating table to contest liability in court").  This further supports a higher royalty than the Via Licensing fees.  Dr. Meyer fully supported her methodology; it is her conclusions that T-Mobile dislikes.[7]

---

reasonable, and non-discriminatory (FRAND) terms.  (Lin Ex. 21, Napper Tr. 270-271).  OTI was under no such obligation.

[7]     T-Mobile has cited no controlling precedent supporting the proposition that the Via Licensing rates must be disregarded, and its district court cases are distinguishable.  *Dataquill, supra* at *7 ("the Google agreement

### 3.      Dr. Meyer Correctly Gave Little Weight to Prior OTI Licenses

Dr. Meyer did not "ignore" OTI's prior licenses to Samsung and CIDC.  (Br. at 2, 5).

Rather, she considered them and explained that those licenses do not establish a royalty rate for

the '043 Patent, insofar as they: (1) reflect broad product development relationships, (2)

contemplated a different use of the invention than T-Mobile (i.e., to manufacture low cost, low

profit Monochips for use in smart cards, not to provide high profit margin mobile payment

services using NFC phones), and (3) date from 1998 and 2002, well before NFC was adopted for

mobile payments, and the date of the hypothetical negotiation.  (Meyer Rpt. ¶¶55-57).  See

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1211-1212 (Fed. Cir. 2010) (evidence of

different circumstances of previous license allowed jury to properly discount its importance);

*Dataquill, supra* at *6 (denying in relevant part motion to exclude damages expert report, since

Federal Circuit case law "does not require an expert to rely on all comparable licenses").

T-Mobile's oversimplification of Federal Circuit precedent (Doc. No. 143 at 20:

"repeatedly chastised expert for ignoring the patentee's low-value licenses…") is unsupported.[8]

The relevant issue is not the value *per se* of prior licenses, but the circumstances under which the

prior licenses were entered into.  *LaserDynamics, supra* at 77-78 ("[t]he propriety of using prior

settlement agreements to prove the amount of a reasonable royalty is questionable.");  *Wordtech*

*Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308 (Fed. Cir. 2010) (prior lump-sum

litigation settlements failed to support lump-sum verdict, since they failed to describe how the

---

is not even a patent license, it is a revenue sharing agreement"); *AVM Techs, LLC v. Intel Corp.*, 2013 WL 126233 (D. Del. Jan. 4, 2013) (criticizing expert for improperly using entire market value as the basis for royalties, and denying motion to strike pending live testimony prior to trial); *Country Road Music, Inc. v. MP3.com, Inc.*, 279 F.Supp.2d 325, 330-331 (S.D.N.Y. 2003) (excluding damages report in copyright case for relying on license for a different use, having substantially different terms).

[8]

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

parties calculated the settlement amounts). ████████████████████████████

████████████████████████████████████████████████████████████████[9]

### D.   There is Sufficient Basis for the Initial Lump Sum Component of Dr. Meyer's Opinion

Dr. Meyer's analysis showed that the Via Licensing NFC patent licensing pool consumer device rates would still have understated a reasonable royalty for the '043 Patent.  (Meyer Rpt. ¶72; Lin Ex. 2, Meyer Tr. 200:22-203:7). ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

▪ ████████████████████████████████████████
████████████████████████████████████

▪ ████████████████████████████████████████
████████████████████████████

▪ ████████████████████████████████████████
████████████████████████████████████████
██████████████████

▪ ████████████████████████████████████████
██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

▪   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████

T-Mobile's issue is with the importance Dr. Meyer gave to these facts, but that goes to weight, not admissibility of her testimony.  *Concord Camera Corp. v. Fuji Photo Film Co.*, 2000 WL 1013958 (S.D.N.Y. July 24, 2000) (admitting expert testimony on damages despite eight identified methodological disputes).

### E.    T-Mobile's Entire Market Value Rule Argument is Misplaced

T-Mobile argues that Dr. Meyer "violate[d] the entire market value rule" (Doc. No. 143 at 21) by using T-Mobile's projections for its participation in ISIS.  This fundamentally misunderstands the entire market value rule, because Dr. Meyer never applied the rule at all.

Under 35 U.S.C. § 284, OTI is entitled to damages for infringement that are no "less than a reasonable royalty for the use made of the invention by" T-Mobile.  As the Federal Circuit explained, "it is generally required that royalties be based not on the entire product, but instead on the smallest salable patent-practicing unit…"  *LaserDynamics, supra* at 67.  The Federal Circuit further explained:

> The entire market value rule is a narrow exception to this general rule.  If it can be shown that the patented feature drives the demand for an entire multi-component product, a patentee may be awarded damages as a percentage of revenues or profits attributable to the entire product.

*Id.* (emphasis added; citations omitted).  There, the patent at issue covered optical disc drives ("ODD"), but plaintiff's expert applied a 2% royalty rate to the total revenues from sales of laptop computers.  The Federal Circuit held that "the royalty was expressly calculated as a percentage of the entire market value of a laptop computer rather than a patent-practicing ODD alone.  This, by definition, is an application of the entire market value rule."  *Id* at 68; see also,

*Cornell University v. Hewlett-Packard Co.*, 609 F.Supp.2d 279 (N.D.N.Y. 2009, Rader J.).

Stated otherwise, the entire market value rule says nothing about the royalty *rate* itself, but only the royalty *base* to which a percentage royalty is applied.  Here, the base is the smallest salable unit that includes all components of the '043 Patent claim: the NFC phone (which includes the antenna interface) and the SWP SIM card (which includes the semiconductor device). ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

T-Mobile's complaint (Doc. No. 143 at 24) that Dr. Meyer considered T-Mobile's expected profits from marketing a mobile wallet that uses the infringing technology is not a basis to exclude her entire opinion.  But Dr. Meyer did not apply any rate to T-Mobile's hundreds of millions of dollars in revenues from ISIS.  In any event, those numbers are a consequence of the infringement: T-Mobile's willingness to pay for a license – by definition – is based on its expected gains from using the patented technology, i.e., distributing NFC phones in order to market a mobile wallet product.  (Meyer Rpt. ¶¶34-49).  Without the ability to use that technology, T-Mobile was at risk of losing those expected profits.  (Meyer Rpt. ¶49).

## VI.   CONCLUSION

Dr. Meyer and Mr. Napper used the same methodology, and arrived at similar licensing structures.  Both determined that the appropriate royalty base is an infringing NFC phone with SWP SIM card, and both agreed that the royalty rate should be a fixed dollar amount per infringing device.  The points of disagreement are the amount of that royalty rate, and whether the license would have included an initial payment, as did many industry licenses.  These are not differences of methodology, but rather a classic disagreement between experts on the value of the technology that T-Mobile has appropriated for itself.  T-Mobile's motion must be denied.

Dated:  April 28, 2014                    PEARL COHEN ZEDEK LATZER LLP


                        By:      ___/s/Guy Yonay_____
                                 Guy Yonay (GY-3028)
                                 GYonay@pearlcohen.com
                                 Clyde A. Shuman (CS-6351)
                                 CShuman@pearlcohen.com
                                 Jessica W. Lin (JL-9029)
                                 JLin@pearlcohen.com
                                 1500 Broadway, 12th Floor
                                 New York, NY 10036
                                 Tel: (646)878-0800
                                 Fax: (646)878-0801

                                 *Attorneys for Plaintiff-Counterclaim Defendant*
                                 *On Track Innovations, Ltd.*


                                      26

## CERTIFICATE OF SERVICE

I certify that on April 28, 2014, I served the foregoing ON TRACK INNOVATIONS

LTD.'S OPPOSITION TO T-MOBILE'S MOTION TO STRIKE DR. MEYER'S DAMAGES

REPORT and the DECLARATION OF JESSICA W. LIN in support thereof on counsel of

record for Defendant-Counterclaim Plaintiff T-Mobile USA, Inc. by sending a copy via email to:

> John C. Hueston
> Douglas J. Dixon
> IRELL & MANELLA LLP
> 840 Newport Center Dr., Ste. 400
> Newport Beach, CA 92660
> Phone: (969) 760-0991
> Fax: (949) 760-5200
> jhueston@irell.com
> ddixon@irell.com
>
> Ellisen S. Turner
> Ben Haber
> IRELL & MANELLA LLP
> 1800 Avenue of the Stars, Ste. 900
> Los Angeles, CA 90067
> Phone: (310) 277-1010
> Fax: (310) 203-7199
> eturner@irell.com
> bhaber@irell.com
>
> Eric J. Lobenfeld
> Ira J. Schaefer
> Robert R. L. Kohse
> HOGAN LOVELLS LLP
> 875 Third Avenue
> New York, NY 10022
> Tel: (212) 918-3000
> Fax: (212) 918-3100
> eric.lobenfeld@hoganlovells.com
> ira.schaefer@hoganlovells.com
> robert.kohse@hoganlovells.com

　　　　　　　　　　　　　　　　　　　　　　　　　 __/s/Guy Yonay__
　　　　　　　　　　　　　　　　　　　　　　　　　　　 Guy Yonay