UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ON TRACK INNOVATIONS LTD., an Israeli company,<br><br>        Plaintiff-Counterclaim<br>        Defendant,<br><br>   vs.<br><br>T-MOBILE USA, INC., a Delaware corporation,<br><br>        Defendant-Counterclaim<br>        Plaintiff. | Case No. 1:12-cv-02224-AJN-JCF<br><br><br>**Unredacted Version Contains HIGHLY CONFIDENTIAL-OUTSIDE COUNSEL ONLY Information Subject to Protective Order** |

**T-Mobile's Memorandum Of Law In Support Of Its Motion To
Strike Dr. Meyer's Conclusory And Unreliable Damages Opinions**

**IRELL & MANELLA LLP**
John C. Hueston (jhueston@irell.com)
Douglas J. Dixon (ddixon@irell.com)

Ellisen S. Turner (eturner@irell.com)
Benjamin Haber (bhaber@irell.com)
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
Telephone:    (310) 277-1010
Facsimile:    (310) 203-7199

*Attorneys for Defendant and
Counterclaimant
T-MOBILE USA, INC.*

**TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ...................................................................................................1

II. BACKGROUND ...................................................................................................2

    A. The Patent-in-Suit: OTI's Claimed "Invention" Removed a Switching Element From a Prior-Art Dual-interface Smart Card...........................................................................................................2

    B. OTI's Infringement Allegations. ................................................................3

    C. Isis – A Separate Company Whose Technology Is Not Accused......................................................................................................3

    D. OTI's Proposed Royalty .............................................................................5

III. LEGAL STANDARDS ........................................................................................7

    A. Unreliable Expert Opinions Must Be Excluded. ........................................7

    B. Conclusory Expert Opinions Are Unreliable And Must Be Excluded .....................................................................................................8

    C. Expert Opinions That Do Not Assist The Trier of Fact Must Be Excluded..................................................................................................9

IV. ARGUMENT.......................................................................................................10

    A. The Court Should Strike Dr. Meyer's Testimony Regarding Her Running Royalty Rate Because It Is Arbitrary and Unreliable. ...............................................................................................10

        1. The Via NFC patent program is not comparable to the hypothetical negotiation license, either technically or economically.....................................................................................11

        2. The Via NFC patent program is not evidence of a "customary" rate in the industry. ......................................................14

    B. The Court Should Exclude Dr. Meyer's Testimony Regarding a $4 million Upfront, Lump-sum Kicker as Unreliable and Unsupported by the Facts. ..........................................................................16

        1. Dr. Meyer Offers No Analysis by Which to Evaluate Her $4 Million Lump Sum Other Than Her Own *Ipse Dixit* ..........................................................................................16

        2. Dr. Meyer's $4 Million Upfront, Lump Sum Is Unrelated to the Facts. ................................................................18

    C. Dr. Meyer's Proposed Royalty Violates the Entire Market Value Rule. ................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

V.       CONCLUSION..........................................................................................................25

# TABLE OF CONTENTS

**Page**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ............................................................ 8

*AVM Technologies, LLC v. Intel Corp.*,
    2013 WL 126233 (D. Del. Jan. 4, 2013) ...................................... 13

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18 (2d Cir.1996) ............................................................... 9

*Bourjaily v. United States*,
    483 U.S. 171 (1983) ....................................................................... 7

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
    239 F.3d 179 (2d Cir. 2001) .......................................................... 8

*Cornell Univ. v. Hewlett-Packard Co.*,
    609 F. Supp. 2d 279 (N.D.N.Y. 2009) ........................................ 21

*Country Rd. Music, Inc v. MP3.com, Inc.*,
    279 F. Supp. 2d 325 (S.D.N.Y. 2003) ......................................... 14

*Country Rd. Music, Inc. v. MP3.com, Inc.*,
    279 F.Supp.2d 325 (S.D.N.Y. 2007) ............................................ 9

*Damon v. Sun Co., Inc.*,
    87 F.3d 1467 (1st Cir. 1996) .......................................................... 9

*DataQuill Ltd. v. High tech Computer Corp.*,
    2013 WL 1284381 (S.D. Cal. Apr. 16, 2012) ........................ 13, 14

*Daubert v. Merrell Dow Pharms., Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ..................................................... 9, 10

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ............................................................. 7, 9, 16

*DSU Med. Corp. v. JMS Co.*,
    296 F. Supp. 2d 1140 (N.D. Cal. 2003) ....................................... 9

*Dynetix Design Solutions, Inc. v. Synopsys, Inc.*,
    2013 WL 4538210 (N.D. Cal. 2013) ........................................... 21

*ePlus, Inc. v. Lawson Software, Inc.*,
    764 F. Supp.2d 807 (E.D. Va. 2011) ........................................... 18

*General Electric v. Joiner*,
    522 U.S. 136 (1997) ..................................................................... 18

# TABLE OF AUTHORITIES

**Page**

*Georgia Pacific Corp. v. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................................... 14, 15

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983) .............................................................................. 15

*Integra Lifesciences I, Ltd. V. Merck Kgaa*,
    331 F.3d 860 (Fed. Cir. 2003) ................................................................................ 11

*KumhoTire Co. v. Carmichael*,
    526 U.S. 137 (1999) ..................................................................................... 7, 8, 9

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012) ........................................................................... passim

*Leveraged Innovations v. NASDAQ Omx Group*,
    2012 WL 4062100 (S.D.N.Y. Sept. 14, 2012) ........................................................ 9

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009) ........................................................................ 11, 13

*Mannion v. Coors Brewing Co.*,
    2007 WL 3340925 (S.D.N.Y. Nov. 7, 2007) .......................................................... 10

*Microsoft Corp. v. Datatern*,
    2012 WL 3682915 (S.D.N.Y. Aug. 24, 2012) ......................................................... 9

*Oracle Am. Inc. v. Google Inc.*,
    798 F.Supp.2d 1111 (N.D. Cal. 2011) .................................................................... 24

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010) .......................................................................... 21, 25

*Riles v. Shell Exploration & Production Co.*,
    298 F.3d 1302 (Fed. Cir.2002) ............................................................................... 16

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
    862 F.2d 1564 (Fed. Cir. 1988) .............................................................................. 20

*Trell v. Marlee Electronics Corp.*,
    912 F.2d 1443 (Fed. Cir. 1990) .............................................................................. 15

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ........................................................................ 16, 24

*Unisplay, S.A. v. American Electronic Sign Co., Inc.*,
    69 F.3d 512 (Fed. Cir. 1995) .................................................................................. 20

## <u>TABLE OF AUTHORITIES</u>

<u>**Page**</u>

<u>Statutes</u>

35 U.S.C. § 284.................................................................................................. 21

<u>Rules</u>

Fed. R. Evid. 401 ............................................................................................... 8

Fed. R. Evid. 402 ............................................................................................... 10

Fed. R. Evid. 403 ............................................................................................... 10

Fed. R. Evid. 702 ............................................................................................... 7, 8

## I.     INTRODUCTION

Expert opinions must be based upon sufficient facts or data and be the product of reliable principles and methods.  Failing that, the opinions must be excluded.  OTI's damages expert, Dr. Christine Meyer, has submitted a report that requires exclusion under these principles.

Dr. Meyer has opined that a reasonable royalty for the single patent at issue in this case (the '043 patent) would have two components, neither of which satisfies the demanding criteria for admissibility. The first component is a running royalty copied from an old Internet advertisement for a now defunct patent pool involving patents of an unknown quality and quantity.  There is no evidence that anyone ever took a license to this short-lived patent pool or paid any royalties.  Dr. Meyer has never seen any signed license.  She also concedes that she has no idea what patents, or even how many, were included in the pool.  Indeed, her only basis for attempting to apply the rates from this defunct patent pool to the '043 patent is that both generally concern Near Field Communication technology.  That is it.  Dr. Meyer does not identify any other comparable patent agreements, or any other basis whatsoever, for her running royalty.  In fact, although she recognized that OTI had previously entered into two license agreements involving the '043 patent, Dr. Meyer dismissed them as irrelevant.  All of this is contrary to well-settled Federal Circuit law.

The second component of Dr. Meyer's royalty is a $4 million upfront, lump-sum kicker. Dr. Meyer believed her borrowed running royalty was too low, and thus she decided that adding another $4 million payment on top would have been "reasonable."  But why and how she got to $4 million is a mystery.  She did not offer an explanation in her report.  And at her deposition, she said only that $4 million is half of $8 million, which, according to Dr. Meyer, is the amount of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ around the time of the hypothetical negotiation.  But why the ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ would have been the starting point to determine a lump-sum payment to the '043

patent and why half would have been "reasonable" are supported only by Dr. Meyer's *ipse dixit*. Significantly, a $4 million upfront payment is ███████████████████████████████████ ████████████████████████████████████████████, which explains, in part, why Dr. Meyer chose to ignore these prior licenses.

## II.   BACKGROUND

### A.   The Patent-in-Suit: OTI's Claimed "Invention" Removed a Switching Element From a Prior-Art Dual-interface Smart Card.

In this lawsuit, OTI asserts U.S. Patent No. 6,045,043 (the "'043 Patent" or the "OTI patent"), which relates to a "contact/contactless data transaction card" – *i.e.*, a dual-interface smart card.  (*See* Ex. 1 ('043 Patent) at 1:1-2.)  The patent expires no later than December 30, 2017.  (*Id.*; *see also* Ex. 2 (Meyer Rep.) ¶ 19.)

Initially, smart cards relied on small metal "contacts" on the card, which allowed the card's microprocessor to communicate with an external device called a "reader."  The card was inserted into the reader, which made an electrical connection directly to the contacts to transfer data to and from the card.

For user convenience and device reliability reasons, manufacturers also developed an alternative "contactless" mode of communication for smart cards.  For contactless mode, the smart card typically included an antenna that communicated wirelessly with a separate antenna on the reader.  One particular sort of wireless data transfer is called "Near-Field Communication" (NFC) because the card and the reader communicate only when placed in very near proximity to each other.

By the late 1980s, dual interface smart cards, having both contact and contactless modes of operation in a single card were widely known and available.  The '043 patent admits as much:

> Both "contact" and "contactless" devices are known per se. Generally, such devices are in the form of smart cards provided either with electrical contacts for effecting direct electrical contact with a card reader; or else they are provided with a coil antenna for effecting contactless bi-directional communication with a remote card reader. [The prior art] discloses a chip card allowing both contact and contactless communication in a single smart card.

(*See* Ex. 1 at 11-19.)  The patent's purported contribution to this old, ubiquitous dual-interface smart-card technology was a simple engineering design choice to (a) use an off-the-shelf microprocessor with two separate input/output (I/O) interfaces, one used for "contact" data arriving from contacts and another used for "contactless" data from an antenna, and (b) eliminate a "switching element" that one particular prior-art reference used on the data path for the contact and contactless data.

Dr. Meyer confirmed that this is her understanding of the claimed technology:  "I understand that an important element of the patented invention is that it allows a single microprocessor (*e.g.*, a secure element) to be accessed by two means (*i.e.*, both a contact and contactless mode of data transfer)."  (Ex. 2 ¶ 19; *see also* Markman Order at 3.)

### B.   OTI's Infringement Allegations.

OTI contends that T-Mobile infringes the '043 patent in connection with NFC phones that T-Mobile provides to its subscribers.  The accused products are certain NFC-enabled phones, designed and manufactured by companies like Samsung and Sony, when combined with a Single Wire Protocol ("SWP") SIM card (or SWP UICC), designed and manufactured by Gemalto.[1]  (*See* Ex. 3 (Apsel Rep.) ¶¶ 80-81.)  OTI's infringement theory requires that a Gemalto SWP SIM card be inserted into an NFC-enabled mobile phone.  (*See id.*; *see also* Ex. 2 ¶ 20.)  Neither the phone nor the SWP SIM standing alone infringe.

### C.   Isis – A Separate Company Whose Technology Is Not Accused.

T-Mobile has invested in a company called Isis, which is a joint venture between AT&T, Verizon, and T-Mobile.  (*See* Ex. 4 (TMUS-OTI0000504-505).)  Isis is a non-party that provides, among other things, a mobile payments platform and infrastructure that allows merchants and customers to complete transactions using mobile devices.  (*See id.*)

Isis's business includes an enormous array of industry partnerships, complex business

---

[1] Mobile phones typically store certain user-specific data on a removable card called a "UICC SIM card." The acronyms stand for Universal Integrated Circuit Card (UICC) Subscriber Identification Module (SIM).

and financial arrangements, technology infrastructure, and mobile software applications that have nothing to do with OTI's patent and are not alleged to infringe.  Aspects of the ecosystem that Isis and its business arrangements provide include, as just a few examples:

- Software applications and a software platform for a "mobile wallet" that turns a mobile phone into a payment device that can replace the slew of credit and debit cards in a physical wallet. This platform allows Isis to offer bank-grade security and service and to become a link in the payment provider chain using a host of mobile technologies, including secure data transfer, SMS text messaging, and various forms of wireless communication.  (*See* Ex. 4; Ex. 5 (TMUS-OTI0000748-750); Ex. 6 (TMUS-OTI0014336-14337); Ex. 7 (TMUS-OTI0049967).)

- A Trusted Service Manager (TSM) platform that enables mobile commerce and connects mobile operators and service providers with financial institutions to provide end-to-end security with mobile payments. The TSM also supports value-added services such as customer loyalty programs and coupons. (Ex. 6; Ex. 7.)

- Business arrangements and Isis technology licenses for point-of-sale terminals and other devices and software for merchants to accept mobile payments.  (*See* Ex. 8 (Brian Bell Tr.) 116:17-23; Ex. 9 (TMUS-OTI0049947-49948).)

- Complex business arrangements and partnerships (and associated technology infrastructure and data interchanges) with credit and debit card issuers, banks, and merchants necessary to enable the required financial transactions.  (*See* Ex. 10 (TMUS-OTI0079366-72); Ex. 9.)

None of these features or partnerships that lead to Isis's value have been alleged to depend on the technology claimed in OTI's patent.  Isis's technology is not accused here.  Instead, the accused products are NFC phones combined with SWP SIM cards that are alleged to implement the specific circuit layout and interconnections that the '043 patent requires.  (*See* Ex. 3 ¶¶ 80-81.)  As explained above, the '043 patent relates to a particular circuit design choice for connecting a set of common components that had already been used together for more than a decade before OTI filed its patent.  T-Mobile does not, either as a separate company or due to its investment in Isis, dictate which of the many available microelectronic design options are selected for use in the accused products.

### D.     OTI's Proposed Royalty.

OTI contends that its switchless card technology is a non-trivial component in the NFC phones and SWP SIM cards that T-Mobile provides to its subscribers, which can then be used to transact on the platform that Isis provides.  From this, despite the mammoth financial, business, and technological underpinnings that Isis uses to generate revenue for Isis and its shareholders, OTI contends that it is somehow entitled to a share of all revenue that T-Mobile obtains from Isis both as an equity investor and as a participant that uses Isis's platform and business arrangements.  From this dubious basis, OTI asserts that it is entitled to a royalty consisting of:

- An upfront, $4 million lump-sum payment, *and*

- A running royalty ranging from $0.490 to $0.049, depending on volume, for each SWP SIM card that a T-Mobile subscriber "activates" for use in an NFC phone.

(Ex. 2 ¶¶ 79, 80.)  Through October 2013, that amounts to ███████.  (*Id.*)

Dr. Meyer derived her proposed royalty, not from OTI's prior licenses for the '043 patent – those she ignored – but based on data points that have no bearing on the claimed invention's value and that the Federal Circuit has roundly rejected as a basis for patent damages.

For her running royalty rate, Dr. Meyer simply adopted the rates that a patent licensing entity named Via Licensing listed on an old web page for a pool of patents ostensibly relating to NFC.  (*Id.* ¶ 69.)  Dr. Meyer has no idea which, or even how many, patents were licensed in the Via NFC patent program and has no idea how that technology may have differed from OTI's patent. (*Id.* ¶ 70 ("The patents that were included in the program are not reported in the publicly available information.").)  Indeed, her only basis for comparison is that "Via Licensing described the patents included in the pool as ones 'deemed essential to Near Field Communications.'"  (*Id.*)  But there is no evidence that the '043 patent is similarly essential to the practice of NFC, and Dr. Meyer never explains why the single '043 patent is as valuable (or more valuable, given her specious lump sum kicker) than a pool of standard-essential patents.  Nor could she, because, again, she does not know what patents were included in the Via NFC patent program, and thus has no basis for a comparison.

The other data point, which Dr. Meyer characterized as "important" to her proposed royalty, was T-Mobile's forecasted "net present value" ("NPV") calculations for its entire investment in Isis.  (*Id.* ¶ 45; Ex. 11 (Meyer Tr.) 159:9-18.)  These NPV calculations were based on T-Mobile's entire monetary investment in Isis as a company and revenue from T-Mobile's participation in Isis, by whatever means — *i.e.*, the total value of the business opportunity to T-Mobile.  (See Ex. 12 (Ewens Tr.) at 47:9-17, 67:7-16, 82:11-83:1; *see also* Ex. 13 (TMUS-OTI0049935-36); Ex. 14 (TMUS-OTI0079358-59).)  The NPV value calculations did not depend on or value any particular circuit design in a mobile phone or its components, any patents, or contemplate the value of any patent licenses.  They did not project or reflect the value, if any, to T-Mobile or Isis of the '043 patent's switchless circuit design.

Nevertheless, Dr. Meyer conducted no analysis to identify, let alone apportion, the separate value of the '043 patent from the other aspects of Isis reflected in the NPV calculations.  If ever she did any such analysis, she certainly made no attempt to explain it in her report.  Nor did she make any provision for the fact that the NPV calculations she relied upon included projected revenue that would be obtained for years long after the '043 patent expires.  Notably, the speculative NPV forecasts for Isis varied immensely in the "early 2012" timeframe that Dr. Meyer uses for the hypothetical negotiation – ████████████████████████████ ████████████████████████████████████████████████.  (*See* Ex. 15 (Meyer Rep. Exs. 3a, 3b).)  Moreover, there is no evidence that T-Mobile has ever made any patent licensing decisions based on any NPV calculations, whether for Isis or any other business.

Dr. Meyer provided no cogent explanation for how she reached her $4 million lump-sum payment.  She only discussed it barely in passing in the final two paragraphs of her report.  In essence, she simply concluded that the royalties she had calculated from the Via NFC patent pool were not big enough so she needed to add more.  Her *entire* opinion explaining how she derived the $4 million kicker is as follows: "Given the factors that I have identified and the information available to me, a lump-sum payment of at least $4,000,000 would, in my opinion, be

reasonable." (*See* Ex. 2 ¶ 80.)  She opined, without explaining why, that "the Via NFC-patent pool royalty rates . . . do not reflect the full value of the '043 patent to T-Mobile" and therefore T-Mobile would also have been willing to pay a lump-sum to OTI for a license.  (*See id.* ¶ 79.) She also once mentions, in passing, that ███████████████████████████████████ ████████████████████████████████████ (*Id.*)  But she offers no evidence, and there is none, to suggest that this $8 million had any relation to OTI, its patent, patent licensing in general, or even to any kind of payment for any kind of technology whatsoever.  When asked, she was unable to offer any testable basis for arriving at her $4 million kicker other than that it is half of $8 million – a figure that her report never relates to anything in particular.  Her report never explains any other basis for how she reached that amount.

### III.   LEGAL STANDARDS

District courts are the gatekeepers of expert evidence.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). Courts must "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  *Daubert*, 509 U.S. at 589.  The party proffering an expert has the burden to show by a preponderance of evidence that the expert's testimony is reliable, relevant, and that the expert is qualified to give her opinion on each subject matter for which it is offered. *Bourjaily v. United States*, 483 U.S. 171, 175 (1983).

### A.   Unreliable Expert Opinions Must Be Excluded.

The admissibility of expert testimony is governed by Federal Rules of Evidence 702, which requires that "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702; *see Daubert*, 509 U.S. at 598.  This rule "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.

It is the court's responsibility as gatekeeper to determine whether the testimony "is relevant, *i.e.*, whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001) (quoting Fed. R. Evid. 401).  The court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

To meet this standard, every step of an expert's analysis must be reliable.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).  "The court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id*.  Although this inquiry is flexible, the Supreme Court identified a number of relevant factors for consideration:

> (1) whether a theory or technique "can be (and has been) tested";
> (2) "whether the theory or technique has been subjected to peer review and publication"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community.

*Id*. at 266 (quoting *Daubert*, 509 U.S. at 593–94) (citations omitted).

## B.   Conclusory Expert Opinions Are Unreliable And Must Be Excluded.

Expert testimony must be "based upon sufficient facts or data." Fed. R. Evid. 702(b).  If the "sufficient facts or data" are not otherwise admissible they must be facts or data upon which experts in the particular field would reasonably rely.  Fed. R. Evid. 703.  "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Amorgianos*, 303 F.3d at 267 (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).  "[A]n expert should not be

permitted to give an opinion that is based on conjecture or speculation from an insufficient evidentiary foundation." *Damon v. Sun Co., Inc.*, 87 F.3d 1467, 1474 (1st Cir. 1996) (quotations omitted).  Expert testimony that consists of conclusory opinions, supported by no explanation or analysis beyond an expert's say-so, should be excluded under *Daubert* as unreliable.  "[A] court should not consider an expert's mere conclusory statements without analytical basis." *Leveraged Innovations v. NASDAQ Omx Group*, 2012 WL 4062100 at *5 (S.D.N.Y. Sept. 14, 2012) (citing *Country Rd. Music, Inc. v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 330 (S.D.N.Y. 2007) ("Where an expert's opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached or assumptions that represent a complete break with the evidence in the record, it should be excluded, and nothing requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (citations and quotations omitted)).[2]  Indeed, "expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) (internal citations omitted).

An expert's assertion of a conclusion and assurance that it is reliable is "not enough." *Daubert v. Merrell Dow Pharms., Inc. ("Daubert II")*, 43 F.3d 1311, 1319 (9th Cir. 1995). Instead, the court's objective when exercising its gatekeeping function is to "make certain" that an expert's testimony is reliable and not a conclusory belief that one parties' position is correct. *Kumho Tire Co.*, 526 U.S. at 152.

### C.    Expert Opinions That Do Not Assist The Trier of Fact Must Be Excluded.

If the Court concludes that the proffered testimony is reliable, the Court next must

---

[2] *See also Microsoft Corp. v. Datatern*, 2012 WL 3682915, at *3 (S.D.N.Y. Aug. 24, 2012) ("a court should not consider mere ipse dixit of an expert — that is, conclusory statements without analytical basis."); *Arista Records LLC v. Usenet.com*, 608 F. Supp. 2d 409, 423 (S.D.N.Y. 2009) ("Expert testimony should be excluded if it is speculative or conjectural or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith.") (citations and quotations omitted).

consider whether the testimony is relevant.  Expert testimony must "fit" the facts such that it "will assist the trier of fact."  *Daubert II*, 43 F.3d at 1320.  This relevance standard involves a significantly higher threshold than Rule 402 and Rule 403 relevance given the "special dangers" of jurors falling prey to the spell of a misguided expert.  *Id.* at 1321 n.17.  Courts must exclude expert testimony unless they are convinced that it speaks clearly and directly to a disputed issue in the case and that it will not mislead or confuse the jury or waste time.  *Id.*

## IV.   ARGUMENT

### A.   The Court Should Strike Dr. Meyer's Testimony Regarding Her Running Royalty Rate Because It Is Arbitrary and Unreliable.

Dr. Meyer's running royalty is arbitrary and unrelated to the facts.  The crucial quantitative data point for her running royalty rate is an old Internet page about the Via NFC patent-pool program—a now defunct program offered by a third party and involving patents of an unknown quality and quantity.  (*See* Ex. 2 ¶ 69.)  Despite admittedly knowing next-to-nothing[3] about this program, including how it compares either technologically or economically to the '043 patent, Dr. Meyer opined that OTI and T-Mobile would have agreed upon a running royalty for each allegedly infringing device "equal to the Via Licensing NFC-patent pool fee structure."  (Ex. 2 ¶ 80; *see also* Ex. 11 (Meyer Tr.) 181:9-11; *id.* at 184:10-12 ("The Via Licensing is part of my analysis as I have described it in my report.").)  No reasonable juror, however, could reach that conclusion for at least the two independent reasons set forth below, and therefore Dr. Meyer's testimony regarding her running royalty rate must be excluded.

---

[3] Dr. Meyer sought to excuse her lack of familiarity with these fundamental aspects of the Via NFC patent program because "[t]he patents that were included in the program are not reported in the publicly available information on the program."  (Ex. 2 ¶ 70.)  But even if that lack of public availability could excuse her failure to identify critical information in a reasonable royalty analysis, which it does not, significantly, she never made any attempt to contact Via to obtain this information.  (Ex. 11 at 187:2-25.)  Of course, courts in this district "do not accept that [a] lack of necessary information justifies receipt into evidence of [the expert's] best guess in its absence…The lack of appropriate data, whatever the reason, does not justify the receipt in evidence of unreliable, unsubstantiated expert testimony." *Mannion v. Coors Brewing Co.*, 2007 WL 3340925, at *4–5 (S.D.N.Y. Nov. 7, 2007).

1.    **The Via NFC patent program is not comparable to the hypothetical negotiation license, either technically or economically.**

"[D]istrict courts performing reasonable royalty calculations [must] exercise vigilance when considering past licenses to technologies *other* than the patent in suit."  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869-870 (Fed. Cir. 2010) (criticizing expert who relied upon licenses that showed "no discernible link to the claimed technology"); *Integra Lifesciences I, Ltd. v. Merck Kgaa*, 331 F.3d 860, 871 (Fed. Cir. 2003) (describing the use of comparisons to other licenses as "inherently suspect because economic and scientific risks vary greatly"). "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012).  Instead, an expert must establish that the licenses relied upon are technologically and economically comparable to a hypothetical license for the patent-in-suit.  *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009) ("Licenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit.").

Before opining that OTI and T-Mobile would have agreed upon a royalty rate "equal to the Via Licensing NFC-patent pool fee structure" (Ex. 2 ¶ 80), Dr. Meyer failed to perform any analysis to compare the benefits and value of the patents covered by the Via NFC patent program to the '043 patent.  Nor could she.  Throughout her deposition, she admitted she knows very little about the program, and therefore lacks the data required to perform the necessary comparison.

Dr. Meyer correctly notes that the Via NFC patent program was marketed as covering "essential patents for the practice of NFC" (*Id.* ¶ 69).  And OTI alleges that T-Mobile uses the specific, switchless technology design choice embodied in the '043 patent in certain NFC phones.  But other than that, Dr. Meyer concedes that she has no other basis upon which to compare either the technology covered by the Via NFC patent program, or the value of that technology, to the particular switchless technology design in the '043 patent:

> Q.      Do you have any knowledge about whether the patents
> involved in the Via Licensing NFC patent program are comparable
> to the '043 patented technology?
>
> A.      In terms of both being related to NFC, I have that
> understanding.  **I don't have anymore detailed understanding
> from a technical standing or anything of that nature as to the
> comparability of the patent.**

(Ex. 11 at 189:9-18 (emphasis added).)  Indeed, without exception, Dr. Meyer admits that she

does not know any details about the patents included in the Via NFC patent program that would,

at a minimum, be indispensable for making such a comparison.  She does not know what patents

were in the program:

> Q.      Is it fair to say that you don't know what patents were
> included in the Via NFC patent program?
>
> A.      **I am not aware of specific patent numbers, no.**

(*Id.* at 188:2-9 (emphasis added).)  She does not know how the patents relate to NFC:

> Q.      Are you familiar with the particular aspects of NFC that the
> patents and the Via Licensing patent program concern?
>
> A.      I don't have a detailed understanding of the patents, no.
>
> Q.      Do you have a general understanding of which aspects of
> NFC the patents in the Via Licensing NFC patent program
> concern?
>
> A.      **Again, I have a general understanding that they
> concern NFC technology but anymore specific than that, no.**

(*Id.* at 188:19-189:8 (emphasis added).)

Nor does Dr. Meyer have any basis to determine whether the scope of the Via NFC

patent program license is comparable to the hypothetical negotiation license.  She has never even

seen a Via NFC license agreement.  (*See id.* at 171:4-172:10.)  She does not know if there are

"any restrictions on what a licensee could do with a covered product under the Via Licensing

NFC patent program."[4]  (*See id.* at 190:18-22.)  She does not know when the patents included in the program expire.  (*See id.* at 188:13-18.)  Indeed, she does not even know how many patents were included in the pool license.  (*Id.* at 188:7-9.)

In an effort to drive up her royalty, Dr. Meyer compounds the problems that her lack of knowledge creates by adopting Via's *patent-pool* rates instead of the *a la carte* rate that Via ostensibly offered for a single patent or patent family.  Via's *a la carte* rates could include any standards-essential patent the potential licensee might select and are substantially lower than the rates Dr. Meyer chose to charge T-Mobile.  Indeed, while Via's rates for an entire patent pool range from $0.490 to $0.049, its *a la carte* rates for a single patent (or even a patent family) are approximately *1/10 of that amount*, ranging from $0.05 to $0.005.  (*See* Ex. 16 (OTI_0010331-333).)  This, of course, is a single patent case.  A broad portfolio license, such as the Via NFC patent-pool program, is not comparable to the license for a single patent, especially when Dr. Meyer knows next-to-nothing about the patents included in the Via NFC patent pool.  *See AVM Technologies, LLC v. Intel Corp.*, 2013 WL 126233 (D. Del. Jan. 4, 2013) (holding "[n]o reasonable juror could consider these broad portfolio license agreements to be comparable in scope to a license for only the [patent-in-suit].");  *see also DataQuill Ltd. v. High Tech Computer Corp.*, 2013 WL 1284381, at *6 (S.D. Cal. Apr. 16, 2012) ("'[W]here a license covers a portfolio of patents or includes other intellectual property or services, Plaintiff must present evidence sufficient to allow the jury to weigh the economic value of the patented feature against the economic value of the features and services covered by the license agreement.'").

In sum, Dr. Meyer has failed to establish that the Via NFC patent program is comparable to the hypothetical license being negotiated between OTI and T-Mobile.  There is no link between the technologies involved, because merely asserting that both licenses concern NFC is insufficient.  *See Lucent*, 580 F.3d at 1328 ("'[Plaintiff]'s brief characterizes the four agreements

---

[4] Significantly, according to the publicly available information, smartcards "are not covered by the NFC pool license."  (*See* Ex. 16.)

as covering 'PC-related patents,' as if personal computer kinship imparts enough comparability to support the damages award.").  Neither T-Mobile nor the trier-of-fact can weigh the economic value of the patented feature of the accused products against the economic value of the features and services covered by the Via NFC patent program, and Dr. Meyer's testimony and any opinions relying upon the Via NFC patent program must therefore be excluded.  *See Country Rd. Music, Inc v. MP3.com, Inc.*, 279 F. Supp. 2d 325, 330–31 (S.D.N.Y. 2003) (excluding a damages expert's testimony that relied on a "single, inapposite license").

> **2.      The Via NFC patent program is not evidence of a "customary" rate in the industry.**

Even if Dr. Meyer had established (and appropriately analyzed) the technical and economic comparability of the Via NFC patent program to the hypothetical negotiated license, which she has not, Dr. Meyer's reliance upon the Via NFC patent program to determine a reasonable royalty would still be improper.  That is because there is no evidence that anyone ever took a license under the now defunct program, and it is therefore irrelevant.  Neither Dr. Meyer, nor anyone else, has ever seen a signed Via NFC patent license or the terms of any such license.

Dr. Meyer discussed the Via NFC patent program in her report under *Georgia Pacific* Factor Nos. 12 and 13.  (*See* Ex. 2 ¶ 69.)  She contends these factors "are similar in nature," so she lumps them together, without explaining whether she believes the Via NFC patent program is relevant to one or the other (or both).  (*See id.*)  In truth, it is not relevant to either.

*Georgia Pacific* Factor No. 12 asks whether there is a "customary" rate for the invention or similar invention in the industry:  "[t]he portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions."  *Georgia Pacific Corp. v. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also DataQuill Ltd.*, 2013 WL 1284381, at *6 ("The inquiry under factor 12 is 'whether there is a customary royalty rate for analogous inventions in this industry.'").  Dr. Meyer contends that the Via NFC patent program is relevant to "the terms under which other holders of NFC-related patents have been *willing to license* those patents."

(*See* Ex. 2 ¶ 69 (emphasis added).)  But a mere *willingness* to license is irrelevant.  Instead, as the Federal Circuit has made clear, "[t]he fact that licenses were *offered* at a particular rate does not show that that rate was the 'established' rate, since the latter *requires actual licenses, not mere offers to license*."  *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (emphasis added).

Here, there is no evidence that there were any actual licensees under the Via NFC patent program.  In fact, just the opposite is true.  In her report, Dr. Meyer admits that the program was short-lived: announced in 2007 and "dissolved" in 2012.  (*See* Ex. 2 ¶ 69.)  She has never seen an executed license agreement for the program.  (*See* Ex. 11 at 171:4-172:10.)  Nor could she identify any actual licensees.  (*Id.* at 170:6-10.)  For a royalty to be established, it "must be *paid* by such a number of persons as to indicate a general acquiescence in its reasonableness by those who have occasion to use the invention."  *Hanson*, 718 F.2d at 1078 (emphasis added).  Without any evidence that anyone paid Via's rates, or anything even approaching them, let alone a sufficient number to demonstrate acquiescence, Via's NFC rates cannot reflect the amount a willing licensor and willing licensee would have agreed to in an arms-length negotiation.  Dr. Meyer's blind reliance upon advertised, but never consummated, Via rates was improper.

Relatedly, even if there were actual licensees under the program, one licensor's patent program hardly establishes a customary rate for all inventions in an industry.  "A single licensing agreement, without more, is insufficient proof of an established royalty."  *Trell v. Marlee Electronics Corp.*, 912 F.2d 1443, 1446 (Fed. Cir. 1990).

The Via NFC patent program is likewise irrelevant to *Georgia Pacific* Factor No. 13, which concerns the apportionment of profit between the patented and non-patented features of the accused instrumentality.  *See Georgia Pacific*, 318 F. Supp. at 1120 ("The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.").  The Via NFC patent program, and its unknown set of patents, of

course demonstrate not a thing about the value OTI's patent compared to the non-patented features in the presently accused products.  Indeed, the program offers the same rate for all consumer devices (*e.g.*, mobile phone) no matter how extensively those devices take advantage of the unidentified patents that the proposed license might cover.  (*See* Ex. 16.)

Accordingly, the Via NFC patent program is irrelevant to *Georgia Pacific* Factor Nos. 12 and 13 – the only two Dr. Meyer identified to which it may be relevant – and therefore Dr. Meyer's testimony regarding the program should be stricken.

**B.      The Court Should Exclude Dr. Meyer's Testimony Regarding a $4 million Upfront, Lump-Sum Kicker as Unreliable and Unsupported by the Facts.**

Dr. Meyer opines that, in addition to a running royalty, T-Mobile would have agreed to pay a $4 million upfront, lump-sum in a hypothetical negotiation with OTI.  That opinion is arbitrary and unrelated to the facts.  An important factor in assessing the reliability of expert testimony is "whether the expert's methodology has been tested and is capable of being tested." *Daubert*, 509 U.S. at 595.  Although some approximation is permitted in calculating the reasonable royalty, "sound economic and factual predicates" for that analysis are required.  *See Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1311 (Fed. Cir.2002).  The expert's testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591.  "If the patentee fails to tie the theory to the facts of the case, the testimony must be excluded."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).

**1.      Dr. Meyer Offers No Analysis by Which to Evaluate Her $4 Million Lump Sum Other Than Her Own *Ipse Dixit*.**

Dr. Meyer's opinion regarding a $4 million upfront payment should be excluded because neither T-Mobile nor the trier-of-fact can evaluate or test Dr. Meyer's methodology (if any) in arriving at her $4 million lump-sum amount.  That is because she never explains it, other than to vaguely offer her conclusory opinion that a $4 million lump-sum would be "reasonable" in light

of everything she has considered.[5]  (*See* Ex. 2 ¶¶ 79, 80.)  When asked, the only quantifiable

thing that Dr. Meyer could point to in her entire report was the $8 million that she claimed was a

███████████████████████████████████████████████████████████████████

███████████████████████████████████  (*see* Ex. 2 ¶ 79; *see also id.* ¶ 42, p. 17 n.65); Ex.

11 at 209:12-25.)  After reciting that figure in a complete *non-sequitor*, her report concludes that

"[g]iven the factors that [she had] identified and the information available to [her], a lump-sum

payment of at least $4,00,000 would, in [her] opinion, be reasonable" (Ex. 2 ¶ 80).  That's it.

Even assuming, however, that this ████████████████ was an appropriate starting point

(which, as explained below, it was not), Dr. Meyer offers no explanation for how she went from

$8 to $4 million, other than her vague reference to unspecified "factors that [she had] considered

and the information available to [her]."  (*See id.* ¶¶ 79, 80.)  But not only did she fail to identify

what specific factors or information she considered in evaluating a lump sum, more important,

she offered no testable explanation for how each contributed to her conclusion that $4 million

would be "reasonable."  (*See id.*)  Nor could she explain it at her deposition:

> Q.      Okay.  Is there any sort of mathematical analysis that you
> did to get to the 4 million?
>
> A.      I put all the information together that I discussed and
> described to you.  In light of the cushion that T-Mobile had and
> then what it would have been able to pay without having to go
> back to its parent company for more funding and determined that,
> you know, probably even a lump sum in the amount of 8 million
> would have been reasonable but certainly 4 million is a
> conservative and reasonable amount.

(Ex. 11 at 209:15-25.)  Indeed, at best, she selected $4 million because it was half of $8 million

and it was something that *she* "would pay" under the circumstances of the case:

> I didn't consider, you know, sort of each and every gradation but I
> think $4 million oftentimes when there is some kind of number
> that a company is thinking about looking at the halfway point of
> that or looking at half of it is a natural starting place to think about.

---

[5]      Nor does she explain why OTI would have sought an additional $4 million if OTI
would "be willing to accept any positive royalty for a license" as she contends.  (Ex. 2 ¶ 51.)

> *Is that something that I would pay?*  And I think in this case it is
> reasonable.  So I don't think there is any reason to believe they
> would have moved to a number other than that.

(*Id.* at 212:3-15 (emphasis added).)[6]  Thus, both T-Mobile and the trier-of-fact are left simply

with Dr. Meyer's *ipse dixit* that a $4 million lump-sum would be "reasonable" without any way

to test that conclusion (other than confirm it is indeed half of the $8 million ███████████

███████████████████████████████████████████████████████

　　　　Dr. Meyer's baseless opinions are improper.  "[N]othing in either *Daubert* or the Federal

Rules of Evidence requires a District Court to admit opinion evidence which is connected to

existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too

great an analytical gap between the data and opinion proffered."  *General Electric v. Joiner*, 522

U.S. 136, 146 (1997).  And although mathematical precision is not required, an expert may not

simply say "[i]t is so because, I, the expert, say it so."  *See ePlus, Inc. v. Lawson Software, Inc.*,

764 F. Supp. 2d 807, 813-16 (E.D. Va. 2011) (excluding expert's damages testimony because he

failed to articulate how any of the factors he considered permitted a doubling of his base royalty

rate other than his *ipse dixit*), *aff'd in relevant par*t, 700 F.3d 509, 522-23 (Fed. Cir. 2012).

### 2.　　　Dr. Meyer's $4 Million Upfront, Lump Sum Is Unrelated to the Facts.

　　　　Dr. Meyer's opinion regarding her $4 million upfront payment is also improper because it

is not tied to the facts of the case.  There is simply no factual support for either the amount of, or

a royalty structure involving, such an upfront payment.

　　　　Putting aside the lack of discernible, testable methodology in going from $8 to

$4 million, there is no basis even to start the analysis at $8 million.  Dr. Meyer started with $8

million because that was the so-called ████████████████████████████████████████

███████████████████████████████████████████  (*See* Ex. 2 ¶ 79; *see also*

*id.*¶ 42, p. 17 n.65; Ex. 11 at 209:15-25.)  She believes this was ok because "the word 'cushion'

implies to have money for things that were not foreseeable but which were – stood in the way of

---

[6] What Dr. Meyer might personally be willing to pay is, of course, irrelevant.

T-Mobile being able to implement the technology.  And this [*i.e.*, a license to the '043 patent] certainly would have been one of them." (*See* Ex. 11 at 204:2-8).

But even if T-Mobile had requested (and received) such a "cushion" and even if the cushion were for "things that were not foreseeable," as Dr. Meyer assumed, there is no link between the amount of the so-called "cushion" and the economic demand for a license to the claimed technology in the '043 patent.  Absent such a link, any suggestion that the analysis would have begun at $8 million is speculative at best; $8 million is no more a more appropriate starting place than any other.  Boiled down to its essence, this is an opinion that "hey, T-Mobile had an extra $8 million in its pocket, so it might as well have given half of that to OTI" – hardly the sort of expert analysis that would be sufficient to pass through *Daubert's* gate.

Likewise, there is no factual basis for Dr. Meyer's opinion that OTI could have successfully demanded a $4 million upfront payment when licensing the '043 patent.  Dr. Meyer stated that she was aware of "two licenses that OTI has granted for '043 patent" –



. (*See* Ex. 2 ¶¶ 55, 56, 57.)  Admittedly both involved

. (*See* Ex. 17 (OTI_0004706-4731).)

. (*See* Ex. 18 (OTI_0003915-3929); *see also* Ex. 19 (OTI_0003986-0003988).)

Despite these low amounts, Dr. Meyer offers no explanation for how or why OTI would, or could, have been successful in obtaining an upfront, lump-sum payment from T-Mobile that was

Nor is there any factual support for Dr. Meyer's opinion that T-Mobile and OTI would have agreed to a royalty structure involving both an upfront, lump-sum payment and a running royalty.  Tellingly, Dr. Meyer has not cited any evidence that T-Mobile has ever agreed to a royalty structure involving both an upfront, lump-sum payment and a running royalty.  Instead,

she opined that any license would have involved a lump-sum payment based upon four "factors," none of which have anything to do with what structure either party, let alone T-Mobile, would have found reasonable in a hypothetical negotiation:

> T-Mobile would also be willing to pay a lump-sum payment to OTI for a license to the '043 patent because of at least the following factors: (a) T-Mobile's willingness to make substantial upfront investments (including amounts beyond those planned or budgeted; (b) the importance to T-Mobile of being able to use the technology embodied in the '043 patent . . . ; (c) the substantial profits that T-Mobile expected . . . and the cost of delaying its participation in Isis . . . ; and (d) all of the factors that I have described above indicating that the Via Licensing NFC-patent pool royalty rates . . . do not reflect the full value of the '043 patent to T-Mobile . . . .

(Ex. 2 ¶ 79.)  None of these factors favors a lump-sum royalty over a running royalty.

Granted, OTI's prior licenses covering the '043 patent involved ███████████████ ██████████████████████.  (*See* Ex. 17; Ex. 18.)  But Dr. Meyer rejected those license agreements as wholly irrelevant.  She concluded that neither "shed light on the likely outcome of a hypothetical negotiation between OTI and T-Mobile."  (Ex. 2 ¶¶ 56, 57.)  And thus, they cannot justify Dr. Meyer's proposed royalty structure because she expressly ignored them.

Dr. Meyer's decision to ignore OTI's prior licenses that conveyed rights to the '043 patent also renders her proposed royalty unreliable.  The Federal Circuit has repeatedly chastised experts for ignoring the patentee's low-value licenses in favor of irrelevant industry licenses in an effort to drive up the royalty rate.  *See, e.g.*, *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995) (holding that the plaintiff's prior license agreements "should carry considerable weight in calculating a reasonable royalty rate"); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1568 (Fed. Cir. 1988) ("[T]he patentee's usual licensing approach should be considered in assessing a reasonable royalty.").

Indeed, the only "factual" basis for Dr. Meyer's proposed structure appears to be the "Standard Patent License Agreement" of Gemalto, which involves both a lump-sum and a

running royalty.  (Ex. 2 at p. 36 n.127.)  But Gemalto is not a party to the hypothetical

negotiation, and Dr. Meyer offers no basis for suggesting that the parties' negotiation for a

license to the '043 patent would in any way be influenced by a patent license agreement of an

unrelated third party for a different technology.  Thus, Gemlato's "Standard Patent License

Agreement" is irrelevant and therefore inadmissible.  *See ResQNet.com.*, 594 F.3d at 869-870

(To be admissible, expert testimony opining on a reasonable royalty rate must "carefully tie

proof of damages to the claimed invention's footprint in the market place.").  Further, like the

Via patent pool described above, Dr. Meyer has no evidence that anyone signed a license

according to the exact terms in the draft "Standard" Gemalto license that she relied upon.

### C.   Dr. Meyer's Proposed Royalty Violates the Entire Market Value Rule.

Dr. Meyer did not associate her proposed royalty with the value of the claimed invention.

Instead, in calculating her proposed royalty, she relied upon projections for T-Mobile's entire

investment and participation in Isis and its mobile-commerce ecosystem without making any

attempt to apportion those projections to the value of the '043 patent.  That is improper.  It

violates the total market value rule, and as a result her proposed royalty must be excluded.  *See,*

*e.g.*, *Dynetix Design Solutions, Inc. v. Synopsys, Inc.*, 2013 WL 4538210, at *2-*5 (N.D. Cal.

2013) (excluding damages expert's testimony for failing to apportion value of patented feature

from value of the entire multi-component product in violation of the entire market value rule).

The patent laws permit "damages adequate to compensate for the infringement, but in no

event less than a reasonable royalty *for the use made of the invention* by the infringer."  35

U.S.C. § 284 (emphasis added).  As the Federal Circuit has explained, "it is generally required

that royalties be based not on the entire product, but instead on the 'smallest salable patent-

practicing unit.'"  *LaserDynamics*, 694 F.3d at 67 (quoting *Cornell Univ. v. Hewlett-Packard*

*Co.*, 609 F. Supp. 2d 279, 283 (N.D.N.Y. 2009)).  "Where small elements of multi-component

products are accused of infringement, calculating a royalty on the entire product carries a

considerable risk that the patentee will be improperly compensated for non-infringing

components of that product." *LaserDynamics*, 694 F.3d at 67.  "This is especially true for electronic devices, which may include dozens of distinct components." *Id.* at 66.

Under the entire market value rule, however, a plaintiff may seek a reasonable royalty based upon the value of the entire product, including the non-infringing components, if, and only if, "it can be shown that the patented feature drives the demand for [the] entire multi-component product." *LaserDynamics*, 694 F.3d at 67.  For example, in *LaserDynamics*, the court rejected the entire market value rule as applied to a laptop computer and its built-in optical disc drive ("ODD"), because the plaintiff failed to present evidence that the patented features in the ODD drove demand for the laptop computer.  *Id.*  The court commented that "[i]t is not enough to merely show that the disc discrimination method [used in the ODD] is viewed as valuable, important, or even essential to the use of the laptop computer.  Nor is it enough to show that a laptop computer without an ODD practicing the disc discrimination method would be commercially unviable." *Id.*  Instead the correct test is "whether the presence of that functionality is what motivates consumers to buy a laptop computer in the first place." *Id.*

Here, the claimed invention concerns only a tiny fraction of the functionality in the accused smartphones.  These smartphones offer hundreds of features and a wide array of functionality.  The claimed invention, however, concerns only one:  a particular switchless circuit design that can be used as one design option amongst the many different ways to create a device that can use NFC.  Moreover, numerous technologies are required to make NFC work on a smartphone and, here again, the claimed invention concerns only one:  the absence of a switching mechanism in one of many potential circuit layouts.

This is not disputed.  In her expert report, Dr. Meyer acknowledges that only certain "elements of [the NFC technology in the accused smartphones] as implemented by T-Mobile are accused of infringing the '043 patent." (*See* Ex. 2 ¶ 34.)

But Dr. Meyer does not value those specific elements or their role in the "NFC technology" in the accused smartphones, as one would expect (and as is required) in a reasonable

royalty analysis. Instead, Dr. Meyer focused on T-Mobile's investments in and long-term valuations of Isis and the Isis business. Indeed, Dr. Meyer spends over nine pages of her thirty-seven page report discussing how much money T-Mobile had already invested and was considering investing in Isis as well as T-Mobile's net present value calculations of the projected cash flows over the entire lifetime of Isis, a period that extends well beyond the life of the '043 patent. (*See id.* ¶¶ 35-48.) According to Dr. Meyer, these "actions demonstrate that [T-Mobile] was willing to pay substantial amounts for the opportunity to participate in Isis with an expectation that its investments would pay off in the long run." (*Id.* ¶ 48.) Dr. Meyer then conflates "the expectations that Isis and T-Mobile had at the time of the hypothetical negotiation for the commercial success and profitability of the Isis mobile wallet" with the "profitability of the product made under the patent," which she says was "expected to be substantial." (*See id.* ¶¶ 64-65.) At her deposition, she reaffirmed that T-Mobile's NPV calculations, which at times were estimated to be ██████████████████████████, played an important role in calculating her proposed royalty:

> Q. Is it fair to say that the net present value of T-Mobile's investment in ISIS was an important consideration in the reasonable royalty numbers that you reached?
>
> A. The net present value of its participation is certainly – that is the, you know, way in which it expected to benefit from licensing the patented technology and so, yes, that is an important consideration.

(Ex. 11 at 159:9-18; *see also id.* at 157:20-159:7.)

To base her proposed royalty upon the entire value of Isis, however, Dr. Meyer must first demonstrate that the accused functionality drives consumer demand. *LaserDynamics*, 694 F.3d at 67. She made no attempt to do so. She did not demonstrate how or why the claimed invention – eliminating a switching mechanism in an optional circuit design – motivates a customer to buy any smartphones let alone use the Isis mobile wallet software and infrastructure.

Indeed, the only connection between the claimed invention and the revenue projections

from Isis is, as Dr. Meyer admits, the fact that the "payment functionality of the Isis mobile wallet is implemented through NFC technology," certain optional elements of which are accused of infringement.  (*See* Ex. 2 ¶ 34.)  That is not enough.  "Wheels are critical to an automobile, but no one would apportion all of the demand for a car to just the wheels."  *Oracle Am. Inc. v. Google Inc.*, 798 F.Supp.2d 1111, 1115-1116 (N.D. Cal. 2011).

The same is true here.  Even if the claimed invention were "critical" to the accused smartphone's NFC technology or to Isis (and there is no evidence that it is), no one would attribute the demand for the accused smartphones or Isis to the accused functionality such that it would be appropriate to consider the entire net present value of Isis, or T-Mobile's funding requests to its parent company to invest in Isis, in calculating a reasonable royalty.

Nevertheless, Dr. Meyer contends that "all of the future profits that [T-Mobile] expected from marketing a mobile wallet (including at least a substantial portion of the value of its equity in Isis) would be at risk" if T-Mobile refused to obtain a license to the '043 patent.  (*See* Ex. 2 ¶ 49.)  But even if that were true (and it is not), the Federal Circuit has held that the entire market value rule cannot be applied merely because a patented method is "valuable, important, or even essential," or that a product without the claimed invention would be "commercially unviable." *LaserDynamics*, 694 F.3d at 68.  Were the rule otherwise, "a plethora of features" could be deemed to drive demand for the entire product.  *Id.*

Of course, the reason Dr. Meyer sought to discuss T-Mobile's investments in and projected cash flows from Isis is obvious: such large numbers might have a tendency to make Dr. Meyer's proposed royalty, especially her $4 million upfront, lump-sum kicker, look more reasonable.  But the purpose of the entire market value rule, in part, is to prevent exactly that kind of invitation of jury error.  The Federal Circuit has observed that disclosure to the jury of overall product revenues "cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue."  *Uniloc USA*, 632 F.3d at 1320. "Admission of such overall revenues, which have no demonstrated correlation to the value of the

patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is 'adequate to compensate for the infringement.'" *LaserDynamics*, 694 F.3d at 68 (quoting 35 U.S.C.A. § 284). Indeed, "one way in which the error of an improperly admitted entire market value rule theory manifests itself is in the disclosure of the revenues earned by the accused infringer associated with a complete product rather than the patented component only." *Id*. at 68.

The claimed invention is not used in the accused products. But even if one assumes that it is for purposes of the damages analysis, it is but one minor aspect of the circuitry used for NFC functionality of the accused smartphones, and the NFC functionality is but one minor aspect of Isis, which is an entire mobile commerce ecosystem. Dr. Meyer failed to identify any evidence that the patented features drive demand for the accused smartphones, and therefore her discussion of and reliance upon the entire market value of Isis in calculating her proposed royalty violated the entire market value rule and must be excluded. *See ResQNet.com*, 594 F.3d at 869 ("Any evidence unrelated to the claimed invention does not support compensation for infringement but punishes beyond the reach of the statute.").

## V.      CONCLUSION

Dr. Meyer's proposed royalty rests not on a reliable foundation or sound methodology but on speculation, conclusory opinions, and damages analyses and bases that the law does not permit. The only source for her running royalty is not reliable, not comparable, not relevant, and not even a license. Her $4 million lump-sum kicker to drive up her damages award isn't reasonable just because she says so. Dr. Meyer's damages opinions must be excluded.

Dated:  March 31, 2014                                  Respectfully submitted,

                                                        IRELL & MANELLA LLP


By: _____
                                                        Douglas J. Dixon
                                                        Attorneys for T-MOBILE USA, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on March 31, 2014, a true and correct copy of the foregoing was electronically served via email upon the following counsel for Plaintiff:

> Guy Yonay (GY-3028)
> GYonay@pearlcohen.com
> Clyde A. Shuman (CS-6351)
> CShuman@pearlcohen.com
> Jessica W. Lin (JL-9029)
> JLin@pearlcohen.com

By: _____
    Douglas J. Dixon
    IRELL & MANELLA LLP
    Attorneys for Defendant and
    Counterclaimant
    T-MOBILE USA, INC.